HERMAN SCHLUETER v. EAST ST. LOUIS CONNECTING RAILWAY COMPANY, Appellant.—296 S. W. 105.

Division One, April 11, 1927.

1. **NEGLIGENCE: Derailment: Defective Track: Injury to Switchman: Substantial Evidence.** In an action for personal injuries to a switchman riding on the footboard of the tender of a superheater engine, when the tender, running backwards and preceding the engine, was derailed and mashed his foot, it being charged that the derailment was due to a defective track, evidence tending to show that the track, being one of several in a switch yard, was not ordinarily used as a running track, but usually as a

storage or receiving track, and rarely for the passage of heavy engines; that the ties were old, decayed and rotten; that the spikes were worked up by the jolting; that the track at the point of derailment had low joints, was uneven and the rails an inch out of level; that engines in passing over the track leaned to one side, causing a swaying motion; that these conditions had existed for about a year prior to the derailment, and that defendant's trainmaster, who gave the switching crew positive direction to use the track, was frequently at the switch-yard and had occasion to see the various tracks, is substantial evidence that the track was defective and that defendant had knowledge of its defective condition.

2. ———: ———: ———: **Knowledge: Warning.** A railroad company does not have the right, after knowledge of a dangerous defect in a track, to operate its heavy engine over it, without using ordinary care to give notice or warning to the trainmen operating it; and knowledge may be inferred from proof that the defective condition has existed for a year, and that defendant's trainmaster, who supervised the use of the tracks and gave switching crews positive directions to use it, had frequently been in the switch-yard and had occasion to see various tracks in the yard prior to the derailment, although the switch-yard was owned by another company.

3. ———: ———: ———: **Owned by Another Company: Knowledge.** A railroad company which runs its engines over the tracks of another is bound to know that they are in a reasonably safe condition for the use of its employees.

4. ———: ———: ———: **Assumption of Risk: Obvious Defect.** The fact that occasionally, when the usual running tracks in the switch-yard were blocked, it was customary to run engines over the particular defective storage track at the rate of speed at which the engine in question was running when its tender was derailed and plaintiff switchman was injured, does not require him to assume the risk as a matter of law and his injury as due to the usual and ordinary risks incident to his employment, unless the defect in the track was patent and obvious, and the danger was therefore necessarily apparent to him.

5. ———: ———: ———: **Master's Negligence: Assumption of Risk.** A defect in a railroad track or roadbed is the master's negligence, and ordinarily, even under the Federal Employers' Liability Act, the servant does not assume the risk of injury arising out of the master's negligence. A switchman riding on the footboard of a tender, whose derailment is caused by defects in the track, does not assume the risk of his consequent injuries, unless the defect and risk alike are so obvious that an ordinarily prudent person under the circumstances would have observed and appreciated them.

6. ———: **Derailment: Obvious Defects.** It is not the duty of a switchman to be on the lookout for defects in the railroad track over which the engine is passing, and he cannot be charged with obvious danger of a derailment of the tender on whose footboard he is riding unless he knows of the defects in the track or they are plainly observable. And where the defects in the track consisted of old and decayed ties, low joints, loose spikes and uneven rails, and he had never been over it and did not know it was a bad track, it cannot be ruled that these defects, which caused the derailment, were apparent and obvious to him and that as a matter of law he assumed the risk of using the track and the danger of the company's negligence.

7. ———: ———: ———: **Testimony: Contradictory Prior Statement: Question for Jury.** Where plaintiff, the day after the derailed tender crushed his foot and while he was in the hospital, signed a typewritten statement prepared by defendant's representative, in which he was made to

say that "the track involved is in a very bad condition from the fact that the rails were light, being about eighty pounds when new; they were badly worn, and much shorter than regular rails; just prior to the accident I had remarked to the foreman that this was a very unsafe track to run a large superheater engine over," and at the trial he testified that he read a part of the statement and then his eyes gave out and he signed it, and that he had never been over the track, did not know its condition or that it was a bad track before he started down it immediately prior to its derailment, and denied that he had told the foreman that "this was a bad track" before the crew and engine went upon the track, it was for the jury to say whether the typewritten statement or testimony was true, and it cannot be ruled as a matter of law that, assuming his statement alone as being true, the danger of riding on the tender was so obviously plain to him that he cannot recover for his injuries.

8. INSTRUCTION: Broader Than Evidence. An instruction which hypothesizes plaintiff's right to recover on the charges of negligence contained in the petition, and authorizes a finding of no fact which is not supported by substantial evidence, is not broader than either the evidence or pleading.

9. ———: Contributory Negligence: Not Pleaded. In an action based on the Federal Employers' Liability Act, a given instruction to the effect that if the jury find that plaintiff was in the exercise of ordinary care for his own safety and was not guilty of negligence contributing to cause his injury, their verdict should be for plaintiff, but if they find that plaintiff was guilty of negligence contributing to cause his injury their verdict should be for plaintiff, but his damages should be diminished in proportion to the amount of negligence attributable to plaintiff, where contributory negligence is not pleaded, is more liberal to defendant than its pleading warrants and places a greater burden upon plaintiff than is necessary, and if error, is not prejudicial to defendant.

10. ———: ———: Assumption of Risk: Conflicting. And such instruction, in telling the jury that plaintiff may recover notwithstanding his contributory negligence and that his damages should be reduced in proportion to the amount of negligence attributable to him, does not conflict with an instruction given for defendant telling the jury that "plaintiff, when he entered the employ of defendant, assumed the risks, hazards and danger usual, ordinary and incident to his employment, and such further risks, however created, of which he knew, or which were so obvious that he must have known of them, and which he could appreciate, and if you find and believe that the plaintiff was injured by reason of such risk, your verdict must be for the defendant." The plaintiff's instruction relates to contributory negligence, and defendant's to assumption of risk, which are quite different things. Under the Federal Employers' Liability Act, assumption of risk is a complete defense, while contributory negligence is not.

11. ———: Withdrawal of Specified Negligence. Where there is substantial evidence to support each and all the specifications of negligence alleged, the court does not err in refusing to withdraw them from the consideration of the jury.

12. EXCESSIVE JUDGMENT: $12,500: Loss of Foot. Where the jury returned a verdict for $30,275, and the trial judge required that $17,775 of the amount be remitted, and that being done, a judgment for $12,500 was entered, and the evidence shows that plaintiff is 46 years of age, had for ten years been continuously employed as a switchman, was earning $165 to $170 a month, the injury resulted in the amputation of all the toes and approximately half of his left foot, he had not walked on the remaining stump for a year and a half, the wound has not healed, but another operation will be necessary, and it is apparent that at his age plaintiff cannot

engage in profitable railroading or prepare himself for a different vocation, it will not be held on appeal that the judgment is excessive.

---

Corpus Juris-Cyc. References: **Appeal and Error,** 4 C. J., Section 2890, p. 920, n. 53. **Damages,** 17 C. J., Section 445, p. 1113, n. 85. **Master and Servant,** 39 C. J., Section 457, p. 337, n. 92; Section 883, p. 685, n. 14; Section 900, p. 698, n. 59; Section 1332, p. 1141, n. 92; Section 1342, p. 1155, n. 11; Section 1343, p. 1155, n. 14; Section 1363, p. 1186, n. 98; Section 1365, p. 1189, n. 16; Section 1402, p. 1220, n. 71; Section 1418, p. 1241, n. 26; Section 1426, p. 1246, n. 72. **Trial,** 38 Cyc., p. 1521, n. 77; p. 1553, n. 90; p. 1697, n. 2.

Appeal from Circuit Court of City of St. Louis.—*Hon. Wilson A. Taylor,* Judge.

AFFIRMED.

*J. L. Howell* and *S. P. McChesney* for appellant.

(1) The court erred in refusing to give the instruction offered by the defendant at the close of plaintiff's case. (a) Because it is incumbent upon the plaintiff, under the Employers' Liability Act, to prove negligence before his case can be submitted to the jury. Seaboard Air Line Ry. v. Horton, 233 U. S. 492. (b) Because the evidence shows that the work was being done in the usual and customary way when the running tracks were blocked, and whatever injuries plaintiff received were due to the usual and ordinary risks incident to his employment. Seaboard Air Line Ry. v. Horton, 233 U. S. 504; Reed v. Director General of Railroads, 110 Atl. (Penn.) 254. (c) Because the evidence shows that the condition of the track was obvious to plaintiff and he appreciated it; such risk is assumed by him, even though created by the master's negligence. Seaboard Air Line Ry. v. Horton, 233 U. S. 504; Jabobs v. Southern Ry. Co., 241 U. S. 229; Boldt v. Penn. Railroad, 245 U. S. 411; Prior v. Williams, 254 U. S. 43; Quigley v. Hines, 291 Mo. 23; Hines v. Wicks, 220 S. W. (Tex.) 581. (2) The court erred in giving Instruction 1 for plaintiff covering the whole case. (a) Because said instruction was broader than the facts proven. Degonia v. Railroad, 224 Mo. 589; State ex rel. Coal & Coke Co. v. Ellison, 270 Mo. 654. (b) Because said instruction conflicts with defendant's Instruction 3 and is irreconcilable and contradictory of defendant's said instruction. Mansur-Tebbetts Implement Co. v. Ritchie, 143 Mo. 587; State ex rel. Coal & Coke Co. v. Ellison, 270 Mo. 645. (3) The court erred in refusing necessary and proper instructions offered by defendant, being Instructions D, E and G, because plaintiff failed in his proof that an engine of the type could not be safely run over track 1, while, on the other hand, the proof adduced was that while track 1 was a yard track and a slow track, it was safe to run an engine over it at a speed of six or eight miles an hour. Chicago, S. P. M. & O. Ry. Co. v. Kroloff, 217

Fed. 528; Rosemann v. Railroad, 197 Mo. App. 342.   Because the judgment of $12,500 is still excessive.   Kibble v. Railroad, 285 Mo. 603.

*Charles P. Noell* and *Glen H. Mohler* for respondent.

(1) The court properly refused the instruction offered by defendant in the nature of a demurrer to the evidence at the close of plaintiff's case and at the close of the whole case.   (a)   This court has prescribed the test to be applied in determining whether there was substantial evidence supporting the verdict.   Burtch v. Wabash Ry. Co., 236 S. W. 338; Buesching v. Gaslight Co., 73 Mo. 231; State ex rel. v. Sturgis, 276 Mo. 571; Sexton v. Sexton, 295 Mo. 143.   (b) It is negligence under the Federal Employers' Liability Act for a railroad company to order a member of a train crew over a track which is not reasonably safe because of defects and insufficiencies of which it knew or could have known by the exercise of ordinary care. Miller v. Schaff, 228 S. W. 488; St. L. & S. W. Ry. Co. v. Duke, 192 Fed. 306; Vicksburg & Meridian Railroad Co. v. Putnam, 118 U. S. 596, 30 L. Ed. 257.   (c)   The duty of a master to use ordinary care to furnish a reasonably safe place for the servant to work and reasonably safe appliances extends to places and appliances owned by and under the exclusive control of another company, and it is not thereby relieved of the duty of inspection, nor any other non-delegable duties.   Ford v. Ry. Co., 280 Mo. 225; Clark v. Iron & Foundry Co., 234 Mo. 436; Gutridge v. Mo. Pac. Ry. Co., 90 Mo. 474.   (d)   A railroad company using the tracks of another company is liable to an employee on its engine or cars for injuries sustained by reason of defects in the roadbed, tracks, etc., of such other company.   Boston & Maine Railroad v. Brown, 218 Fed. 625; Floody v. Ry. Co., 109 Minn. 228, 123 N. W. 815; Ford v. Ry. Co., 280 Mo. 225; Kanawha Ry. Co. v. Kerse, 239 U. S. 576; Story v. Railroad Co., 70 N. H. 364, 48 Atl. 288; Doyle v. Ry. Co., 127 Mich. 94, 86 N. W. 524; Wisconsin Central Railroad Co. v. Ross, 142 Ill. 9, 31 N. E. 412; Steller v. Ry. Co., 46 Wis. 497, 1 N. W. 112; Mendow v. Railroad Co., 82 Conn. 373; Devine v. Delano, 272 Ill. 166; Rapid Transit Co. v. Edwards, 55 Tex. Civ. App. 543, 118 S. W. 838; New York C. & St. L. Railroad Co. v. Hamlin, 170 Ind. 20, 83 N. E. 343; Lindsay v. Plaster Co., 190 N. W. 275.   (e)   Constructive notice to defendant of the defects and insufficiencies in the track and roadbed may be inferred from long continuance; proof of actual knowledge is not essential.   Miller v. Schaff, 228 S. W. 491; Devine v. Delano, 272 Ill. 166; Kanawha Ry. Co. v. Kerse, 239 U. S. 576; Floody v. Ry. Co., 109 Minn. 228; Story v. Railroad Co., 70 N. H. 364.   (f)   Under the undisputed evidence that plaintiff had never passed over this track before and in the absence of evidence that

the defects were known to plaintiff or plainly observable, it cannot be said that the evidence conclusively proved assumption of risk. Miller v. Schaff, 228 S. W. 491; Choctaw O. & G. R. Co. v. McDade, 191 U. S. 68, 48 L. Ed. 96; T. & P. Ry. Co. v. Archibold, 170 U. S. 671, 42 L. Ed. 1188; U. P. Ry. v. O'Brien, 161 U. S. 457, 40 L. Ed. 766; Kanawha Ry. Co. v. Kerse, 239 U. S. 576. (2) The main instruction given for plaintiff is a correct statement of law, and correctly submitted the issues to the jury. (a) It is warranted by the pleadings and proof. (b) If it placed a greater burden on plaintiff than was necessary, by requiring the jury to negative contributory negligence, defendant cannot complain. Berry v. Railroad, 214 Mo. 604; Schmitt v. Transit Co., 115 Mo. App. 453; Penney v. Kramer, 182 S. W. 756. (c) There is no conflict between Instruction 1 and defendant's Instruction 3. (3) The refusal of defendant's withdrawal Instructions D, E and G did not harm defendant, as plaintiff abandoned the issues sought thereby to be withdrawn. Flach v. Ball, 240 S. W. 469; Dietzman v. Screw Co., 254 S. W. 65; Berry v. Coal Co., 253 S. W. 460; Johnson v. Wabash Railroad Co., 259 Mo. 534. The judgment of $12,500 is not excessive. Zumwalt v. Ry., 266 S. W. 717; Mattice v. Ry., 270 S. W. 306.

SEDDON, C.—This cause has recently been reassigned to the writer to express the opinion of this court. The action is one to recover damages for personal injuries, alleged to have been suffered by respondent because of appellant's negligence. Respondent was in the employ of appellant as a switchman, and was injured by the derailment of an engine tender, upon the footboard of which he was riding in the performance of his duties in the switch-yard of the Missouri Pacific Railroad Company at Dupo, Illinois, about 4:40 o'clock on the afternoon of January 6, 1922. It is conceded by the respective parties herein that the switching movement in which respondent was injured was one in interstate commerce, and hence the action falls within the Federal Employers' Liability Act.

The petition charges appellant with negligence in the following respects:

"(1) Plaintiff further states that the track and roadbed were defective and insufficient in that it was old and out of repair and was uneven and rough, and the rails were of different sizes and weights and were old and worn and were not securely joined, and the ties were old and rotten and not lying upon a firm and even surface and roadbed, and the spikes were loose and the rail joints were loose and uneven, and by reason of such defects, singly and collectively, the plaintiff was injured as aforesaid, and such condition of the track was known or by the exercise of ordinary care could and should have been known to the defendants and their officers and

agents in time, by the exercise of ordinary care, to have prevented plaintiff's injuries, yet they neglected so to do and sent plaintiff over such defective track and thereby caused his injuries.

"(2). Plaintiff further states that the agents and employees of the defendant in charge of the movements of the engine involved knew or by the exercise of ordinary care could have known and should have known that the track was not in a condition in which an engine and tender of the style and type being used could be used with reasonable safety upon it, yet carelessly and negligently, in order to save a little time, sent the engine and tender over the track and caused the plaintiff to be injured as herein stated.

"(3). Plaintiff further states that the track involved was one used merely for the storage of cars and was not designed or intended for the use of large engines to pass over, and was not constructed and kept in condition so that it was reasonably safe for large engines of the kind being used at the time herein mentioned, and that the defendants, and their agents in charge, knew or by the exercise of ordinary care could and should have known that it was so constructed and kept, and that it was not reasonably safe for the passage of such engine and tender, yet they negligently used such track and thereby caused the plaintiff to be injured as herein stated.

"(4). Plaintiff further states that the agents and employees in charge of the speed and movements of the engine ran the engine at a rate of speed that was dangerous and not reasonably safe, considering the size of the engine and the condition of the track, when such agents and employees knew or by the exercise of ordinary care could and should have known of such and the condition of the track before running the engine over it at such speed, yet did so negligently cause the engine to run with a sudden spurt of such negligent rate of speed and caused the plaintiff to be injured as herein stated."

The fourth assignment, or specification, of negligence was withdrawn by the trial court from the consideration of the jury by an appropriate instruction.

The answer is a general denial, coupled with a plea of assumption of risk, as follows: "Further answering, this defendant says that whatever injuries plaintiff sustained, if any, were the result of risks, hazards and dangers usual, ordinary and incident to his employment, or were caused by risks, hazards and dangers which were obvious, or which he knew and could appreciate, and all of which were assumed by him at the time."

No reply appears to have been filed by respondent, but the cause was tried below as though a reply, denying generally the new matter of the answer, had been filed.

The switch-yard at Dupo, Illinois, wherein respondent was injured, was owned and maintained by the Missouri Pacific Railroad Com-

pany, but the evidence discloses that engines and switching crews of other railroad carriers, including the appellant railroad corporation, frequently used the tracks in said switch-yard for the purpose of removing therefrom cars destined for points on connecting railroad lines. The switch-yard extends in a north and south direction and consists of a number of tracks, of which tracks Nos. 7 and 8 are known as "running tracks," and track No. 1, upon which particular track the derailment in question occurred, is known as a "receiving," or "yard" track, and is one of the tracks used by the Missouri Pacific Railroad Company (according to the testimony of its assistant yardmaster) to "put cars on for the north, to be turned over to the terminal or A. and S., whatever connection comes handy to use it for."

Respondent Schlueter testified that he was 46 years of age at the time of his injury and had been in the continuous employ of appellant for ten years, with the exception of five months in the year 1920; that on January 6, 1922, the date of his injury, he was a member of a switching crew consisting of a foreman, another switchman and himself; that the switching crew were ordered by appellant to proceed from East St. Louis to the Dupo switch-yard to get, or remove, six cars of perishable freight, consisting of poultry, fruit and vegetables, known as "hot stuff" in the vernacular, or parlance, of railroad men, which perishable freight was then en route in an interstate movement or shipment; that, in accordance with their instructions, the crew proceeded to the Dupo switch-yard and, when they arrived at the north end of the yard, they went directly to the regular running tracks, Nos. 7 and 8, whereupon the trainmaster of appellant, one Boyer, stopped them and told them that the running tracks were blocked and there was no way to get to the south yard, where the cars of perishable freight apparently had been left standing; that Boyer ordered the crew to go back and come through on track No. 1 to the south end of the yard; that the foreman of the switching crew got off the engine and talked with Boyer, while the engine backed up forty or fifty yards so that the switch to track No. 1 could be lined up, or thrown, to permit the engine to enter upon track No. 1; that the engine then backed south on track No. 1, with the tender on the front, or preceding, end of the train, and the engine was pulling a caboose, which was on the north end of the engine; that respondent, who was known as the "head man," gave the engineer the signal to back down on track No. 1, and, as soon as the train entered the north end of track No. 1, the foreman of the crew ran up and took a customary position upon the east, or right, end of the footboard of the preceding tender of the engine, so as to be in position to signal to the engineer, who was on the east, or right, side of the engine; that respondent thereupon moved over

to the middle of the footboard, next to the drawbar, and the other switchman of the crew took a position on the west, or left, end of the footboard of the tender; that, after the train had proceeded southwardly some distance, or about half the length of track No. 1, the south, or preceding, end of the tender suddenly left the rails of the track, whereupon the foreman and the other switchman, both being on the opposite and outside ends of the footboard, jumped off and were uninjured; respondent, however, who was standing near the middle of the footboard, was not in position to jump off to the side of the track, and his left foot was caught under the wheels, or under the footboard, of the derailed tender and was crushed so badly as to necessitate the amputation of a part, including the toes, of the left foot; that when the tender was derailed, it went to the west side of the track; respondent thought the tender traveled about 200 feet after the derailment, but was afterward told that it had traveled only about 25 feet; although respondent had been in the Dupo switchyard several times, pulling "drags" in and out of the yard, he testified that he did not know the condition of track No. 1 prior to his injury; after his injury, respondent was assisted by two of the crew in walking to the yard office, where he was given first aid treatment; in going to the yard office, he continued south on track No. 1, and observed that the cross-ties of that track were "in pretty bad shape; decayed and rough," and the spikes and rails "seemed to be loose; the spikes were worked up by the jolting." On cross-examination, respondent testified that, before the year 1920, he had seldom been in the Dupo switch-yard; after 1920, he had been to the Dupo yard to bring cars away about five times, three of which times were at night, after dark, and twice in the day time, but he had never been upon track No. 1 before the time of his injury; "didn't know it was a bad track before we used it, before I started down there;" did not say to the foreman that "this was a bad track" before the crew went in on track No. 1; the engine was moving about seven or eight miles an hour, which was ordinary yard speed, at the time of the derailment; respondent was told that the derailment was caused by a spreading rail, but didn't know what was the cause at the time of the derailment; that the track No. 1 was a "faulty track;" that a speed of seven or eight miles an hour is usually considered by railroad men to be a safe speed on yard tracks; was visited in the hospital on the day following his injury and was asked to make or give a statement concerning the accident; the statement was written, by a third party, on a typewriter and brought to respondent to be signed; respondent read the first part of the statement, but "my eyes kind of gave out and I quit and signed it; don't know whether it was correct or not, but I signed it; it may have been correct, but I signed it, and that is all I know." Respondent was asked

at the trial to read over his signed statement and whether the reading of the statement refreshed his recollection, whereupon he replied, "That is as near as I can recollect, yes, sir. Q. That is correct, is it? A. Yes, sir." The signed statement, dated January 7, 1922, is as follows:

"At the time this accident occurred I was on duty, and was assigned to engine No. 134 as head man, under the supervision of foreman Rider; the other helper's name was Sappington. Engine was manned by engineer John Rown, fireman's name is unknown to me. Engine was backing southwards pulling caboose, moving over track No. 1, in the Missouri Pacific Dupo Yards, at a speed of approximately eight or ten miles per hour. The foreman and myself were standing on the footboard on the engineer's side of drawbar, foreman being on the outside in order to pass signals, while I stood up next to the drawbar. Switchman Sappington was on the other footboard on the opposite side of drawbar. This, of course, was the tank of engine No. 134, and was the preceding end. Suddenly from some cause unknown to me the tank trucks jumped, the wheels leaving the rails. Foreman Rider and switchman Sappington jumped off onto the ground on each side of the tracks. The footboard struck the ground, and I did not have an opportunity to jump, and started falling in front of the tank. I grabbed the drawbar with both hands and held on keeping my body off the ground; however, I was unable to keep my feet up, and the toes of my left foot went underneath the wheels, resulting in all of the toes being crushed off.

"The track involved is in very bad condition from the fact that the rails were light, being about 80 lbs. when new. They were badly worn, and I believe some of them had been cut in two, and were much shorter than regular rails. Just prior to the accident I had remarked to the foreman that this was a very unsafe track to run a large superheater engine over. We were en route to the lower end of the Missouri Pacific yards for the purpose of getting a train, and it is the usual custom for us to move down over track No. 8, in passing through this yard. This track is in good condition, but for some reason unknown to me we were instructed by our trainmaster, Mr. J. H. Boyer, to use track No. 1 on this occasion. I presume that he had received instructions from Missouri Pacific yardmaster for us to use this track.

"As aforementioned I am unable to state definitely just what caused tank to leave the rails, but it is my opinion that same was due to the faulty track. The engine proper remained on the rails.

"I have read the above statement, and it is correct.

"HERMAN SCHLUETER (Signed)"

Respondent testified, on redirect examination, that the engine was a "superheater engine," weighing 100 tons, and was the largest

type, or size, of engine used by appellant, but that the superheater type of engine was frequently used in the Dupo switchyard.

Witness Roper testified that he was the assistant yardmaster of the Missouri Pacific Railroad Company on the day of respondent's injury, and had been assistant yardmaster for a period of three years before January 6, 1922; that he had seen, and was familiar with, the condition of track No. 1 prior to the derailment in question; "that portion of the track where the accident occurred was badly out of line; it was uneven; the condition of the ties I wouldn't like to say;" and that the track and rails had been badly out of line for about a year prior to January 6, 1922.

Witness Cox, a locomotive engineer in appellant's employ, testified that he could not say exactly how many times he had run an engine over track No. 1 in the Dupo yard, but possibly had been over that track two or three times a month just prior to respondent's injury; and that he noticed that "the engine leaned to the east between twenty-five or thirty-five car-lengths from the north end of the yard," thereby giving to the engine "a sort of swaying motion."

Witness Mace, who was also a locomotive engineer in appellant's employ, testified that he could not say how often he had run an engine over track No. 1 prior to the date of respondent's injury, but that he seldom had occasion to run over track No. 1; tracks Nos. 7 and 8 were the usual running tracks, and engines were supposed to be run over them at all times, unless those tracks were blocked; track No. 1 was a receiving track and "we just backed the engine in there and got hold of the cars, perhaps two or three car-lengths from the north end; very rare for us to use that to run the engine over;" witness had occasion to run over track No. 1 a short time before respondent was injured on January 6, 1922; "one place seemed to be what you would call low joints; somewhere, I thought, a little nearer the north end than the south; somewhere near the center (middle) of the track; the engine seemed to lean to the east when it went along there;" this low place was between 30 and 40 car-lengths from the north end of track No. 1; witness stated that, in his experience of 38 years in railroading, "there is no receiving track as good as the main line; I don't think those tracks in the receiving yard are ever kept up as well."

Witness Baker testified that he had been track foreman for the Missouri Pacific Railroad Company in the Dupo yard for fourteen years and looked over all the tracks in the yard, including track No. 1; left the yard about 4:40 on the afternoon of the derailment and saw the engine backing in upon track No. 1, but he left the yard before the derailment and did not see track No. 1 until the next morning, when he found the track torn up at a point which was distant a little more than half the length of the track from the north

end, or some 35 or 40 car-lengths from the north end of the track; there were seven or eight ties broken in two and the track was out of line; one set of front wheels of the tender had gone on the outside and one set of wheels was on the middle of the ties and had broken the ties, so that the ties had to be removed; the ground, or soil, underneath the ties at the place of derailment, was gumbo, or a gummy black soil, with a ballast of about nine inches of cinders on top, to hold up the ties out of the gumbo; no one had reported the condition of the track to witness before the derailment; in witness's opinion, the track was in fair condition; the track was all right for ordinary speed of not over seven or eight miles an hour, but was not fit for faster running; track No. 1, at the place of the derailment, was out of level an inch or a half inch, so that it was not usable for fast speed, although it was a "good yard track, safe for speed of six or seven miles an hour to run an engine over;" track No. 1 was used "for shoving cuts and also to go through with an engine, when necessary;" the ties of track No. 1 were not new; they were pine ties about two years old; the drains were fairly good, so that the gumbo soil was not in a dampened condition, especially in summer; the soil under the ties was the "same as the soil in that part of the country."

Witness Boyer testified that he was the trainmaster for appellant railroad corporation, and was at the north end of the Dupo yard when the switching crew, of which respondent was a member, came into the Dupo yard; the yard was completely blocked and witness "put them down through track No. 1;" witness "didn't put the engine down through there hurriedly; I told them to go down through track 1 under control, or slow; I gave the engine foreman caution before starting down through there; if I am around and they are going through slow tracks, I say, 'Be careful going down through there;' I do it in any yard, on yard tracks;" by "being careful," witness meant a speed of about six or eight miles an hour; witness's duties consisted of supervising the switching crews, getting them out of the yard and telling them what track to go in on to relieve other parts of the yard; witness examined track No. 1 after the derailment and found a few ties broken and crushed and the rails kinked; witness believed, from his examination of the track, that the rails had spread; that the derailment was caused by a wide gauge of the track; he made no report of his conclusions to the appellant company.

Witness Warren testified that he was assistant yardmaster for appellant corporation at East St. Louis, Illinois, on January 6, 1922; that his general duties were to "instruct the crews as to what work to do, direct them where to go and what to do;" that he "instructed foreman Rider of that crew (of which respondent was a member)

to go to Dupo to get and bring to East St. Louis six cars of hot stuff (perishable freight) which was in possession of the Iron Mountain division of the Missouri Pacific Railroad Company and turned over to East St. Louis Connecting Railway Company, ready to move; I think the information that I had from Dupo was that the cars were on the hurdy-gurdy, what we call hurdy-gurdy at Dupo; my best recollection is that I told them to get six cars of hot stuff on the hurdy-gurdy track; this crew was performing (at the time respondent was injured) the duties that had been assigned to them by me to get the six cars of hot stuff;" witness knew where the "hurdy-gurdy" track was in the Dupo yard and was also acquainted with track No. 1 in said yard; an engine moving south from the north end of track No. 1 would be on the route from East St. Louis to the "hurdy-gurdy" track; that "perishable goods and hot stuff of that kind is handed to the connecting line as quick as possible, irrespective of time or train; it is rulable with all lines to move freight of that class to the connecting line to which it is assigned as quickly as possible, irrespective of the time of trains."

Respondent adduced evidence tending to show that the six cars of perishable freight, which the switching crew had been ordered to remove from the Dupo yard on the afternoon of respondent's injury, and for which purpose the crew were using track No. 1 at the time of the derailment, were in transit in interstate commerce at the time, and that the prospective movement of said cars by appellant was a part of said interstate movement.

Respecting the nature and permanency of his injury, respondent testified that the flesh was stripped from the bones of his left foot, that he was taken to the hospital a few hours after he was injured and, on the next morning, the surgeons amputated the toes and approximately half of the left foot on the inside, or instep; that he remained in the hospital eight weeks, when he was taken to his home, but thereafter he went to the hospital every other day until the first of January, 1923, to have the foot dressed and treated. At the time of trial, May 7, 1923, about a year and a half after the injury, the wound had not healed, but was still festered and open.

Respondent's physician testified that he examined the injured foot on January 4, 1923, and had thereafter made three or four examinations, the last examination having been made two days before the trial; these examinations disclosed that respondent's left foot had been amputated to about the middle, or a little anterior to the middle, of the metatarsus region, leaving a large scar over the end of the amputated area, with two sinuses still discharging pus; the scar tissue extended down to the bony substance in the amputated area; an X-ray photograph was taken by witness, disclosing considerable necrotic bone and soft tissue. The physician expressed the opinion

that another operation is advisable and necessary, in order to insure the complete healing of the wound, and such operation should consist of the removal of the dead and decayed tissues and bone, and the complete draining of the wound.

The appellant (defendant) offered no evidence upon the issues raised by the pleadings, but requested the giving of a peremptory instruction in the nature of a demurrer to the evidence, which instruction was refused by the trial court. The appellant thereupon requested the court to give six separate instructions withdrawing from the consideration of the jury the several assignments of negligence charged in the petition, all of which instructions were refused. The cause was thereupon submitted to the jury upon certain given instructions which will be discussed and ruled, if necessary, in the course of our opinion. The jury returned a unanimous verdict in favor of respondent, assessing respondent's damages at the sum of $30,275. In due time, appellant filed its motion for new trial, upon the hearing of which motion the trial court entered an order that "defendant's motion for new trial will be sustained on the ground that the verdict is excessive, unless plaintiff, in ten days, will remit $17,775, leaving a net judgment of $12,500; in event of such *remittitur*, the motion will stand overruled." Thereupon plaintiff filed a *remittitur* of $17,775, pursuant to the order of the trial court, final judgment was entered for plaintiff in the sum of $12,500, and defendant's motion for new trial was overruled. Defendant appeals to this court from the final judgment entered.

I. Appellant assigns error in the refusal by the trial court of its peremptory instruction in the nature of a demurrer to the evidence. Appellant contends that the peremptory instruction should have been given, because (a) respondent failed to prove negligence on the part of appellant; (b) the evidence shows that the work in which respondent was engaged was being done in the usual and customary way when the running tracks in the Dupo yard were blocked, and whatever injury respondent received was due to the usual and ordinary risks incident to his employment; and (c) the evidence shows that the condition of track No. 1 was obvious to, and appreciated by, respondent, and hence the risk was assumed by respondent, notwithstanding the fact that the risk may have been occasioned by appellant's negligence. We will dispose of the several contentions aforesaid in their order.

(a) Appellant argues that there is no substantial evidence that track No. 1 was defective, or in dangerous condition, before the derailment, and furthermore that there is no substantial evidence that appellant had knowledge of the defective condition, if any, of said

track prior to the derailment. Reduced to narrow compass, the negligence pleaded is substantially that the track and **Defective Track.** roadbed in question were defective and insufficient and that the agents and employees of appellant in charge of the switching crew knew, or by the exercise of ordinary care could and should have known, the condition of the track and that it was not reasonably safe for the use to which it was put. In passing upon a demurrer to the evidence, we must consider the evidence adduced by plaintiff as true, and we also must indulge in his favor every reasonable inference and intendment to be drawn from the evidence. [Burtch v. Wabash Railway Company, 236 S. W. 338, l. c. 340.]

In our opinion, there is substantial evidence of the defective condition of track No. 1 at, and prior to, the time of respondent's injury. The evidence tends to show that track No. 1 was not ordinarily used as a running track, but was generally used as a receiving or storage track, although perhaps occasionally, but rarely, used for the passage of heavy engines; that the ties upon which the rails were laid were not new, but had been in place for about two years prior to the derailment; that the track at the point of derailment had low joints, was uneven and "was badly out of line;" that engines, in passing over the track, leaned to the east, causing, to an extent, a "sort of swaying motion of the engine;" that the cross ties were "in pretty bad shape, decayed and rough;" that "the spikes were worked up by jolting;" that, after the derailment, seven or eight of the ties in the track were found to be broken in two, and the rails were kinked and out of line; that, while the track might be called a good yard track, it wasn't what could. be called a good running track, and, prior to the derailment, the track was "about an inch or half an inch out of level along there;" that such conditions had existed for about a year prior to January 6, 1922, the date of the derailment; and that appellant's trainmaster, who gave the switching crew positive directions to use track No. 1, was frequently at the Dupo yard, "sometimes every week, sometimes every day for a while," and had occasion to see the various tracks in the switch-yard prior to the derailment.

This division of this court has very recently ruled similar evidence to be sufficient to prove negligence on the part of the railroad employer in permitting the employee, without warning, to use a defective and dangerous track, in the case of Miller v. Schaff, 228 S. W. 488, 490, wherein we said: "It is contended there is no evidence tending to prove the negligence charged and submitted. There was evidence tending to prove that the track through Broken Arrow, including the portion between the house-track switch and the passing-track switch, whereon the injury was sustained, was in bad condition; that near and at the place of accident there was little or no ballast; that some of the

ties were broken; that joints were low and would sink under passing cars to an extent variously estimated from two to six inches; that moving cars on this track would rock and lurch—a fair inference for the jury—violently; that respondent's foot was jerked or thrown or jarred from the stirrup of the car, upon which he was attempting to climb, by an unusual motion of the car which struck a low joint and went down with a 'chug.' The respondent described the way the car went down by indications made before the jury which are not before us. The evidence tended to show the bad condition described had existed for eighteen months or more. We do not understand counsel to contend the facts stated, if they are facts, do not show a defective track and a causal connection between it and respondent's injury. Their argument actually goes to the weight of respondent's evidence, the seeming contradictions therein, and the greater credibility of appellant's witnesses. These were matters properly for the consideration of the jury, and we have no doubt were pressed upon their attention by the able counsel who tried the case. . . . The evidence tended to show the track had been in bad condition for eighteen months or more, and this answers the suggestion that there was no proof of appellant's knowledge of that condition. . . . Further, we are not of the opinion that a railroad company can be held to have the right, after the knowledge of a dangerous defect, to operate its trains over the track containing it for any time after discovery, without notice or warning to those entitled to the protection which ordinary care would afford.''

Somewhat similar facts were ruled to establish the defective condition of a railroad track, and the railroad company's resultant liability in damages to an injured employee by reason thereof, in St. Louis & San Francisco Railway Company v. Duke (C. C. A. 8th Cir.), 192 Fed. 306.

It seems, however, to be the chief contention of appellant that there is no evidence herein that appellant, or its trainmaster, Boyer, who directed the switching crew in question, had knowledge of the defective condition of the track prior to the derailment. As we have said, there is substantial evidence in the record that the defective condition of track No. 1 had existed for at least a year prior to the derailment and that several engineers in appellant's employment had observed the condition of the track, and that the engines leaned, or swayed, in passing over the track at or near the point of derailment. Appellant's trainmaster also testified that he was frequently in the Dupo switch-yard in the performance of his regular duties and that he had occasion to see the various tracks in the yard prior to the derailment. It seems to us that the jury might reasonably and properly have drawn the inference from such evidence that appellant had actual notice or knowledge of the defec-

**Knowledge.**

316 Mo.—81.

tive condition of the track in question prior to the time when respondent was directed by the trainmaster to use the same. But, assuming that the evidence is insufficient to show actual knowledge of the defective condition of track No. 1 by the appellant and its trainmaster, yet we think that the evidence is sufficient to establish constructive knowledge of such condition on their part; or, otherwise expressed, we think that the evidence establishes the fact that appellant and its trainmaster should, or could, by the exercise of ordinary care, have known of such defective condition of the track.

It is argued that the evidence shows that neither appellant nor its trainmaster had control or supervision of the Dupo switch-yard, which was owned, operated and maintained by the Missouri Pacific Railroad Company; hence, it is claimed that the status of appellant's trainmaster was no more than that of a mere licensee. However, appellant's trainmaster testified quite positively that his duties were to supervise the appellant's switching crews while in the Dupo yard, "to get the crews out of there," and to "tell them what tracks to get in on to relieve the other part of the yard." Acting within the scope of such duties and employment, the evidence shows that the trainmaster directed respondent, and the switching crew of which he was a member, to use track No. 1, so that it seems to be clear that appellant retained the direction and control of the work of the switching crew in using the switch-yard of the Missouri Pacific Railroad Company, and track No. 1 in said yard. It has been ruled by this court, and by the courts of other jurisdictions, as well, that a railroad company which runs its engines and trains over the tracks owned by another company is bound to know and to see that those tracks are in a reasonably safe condition for use by its own employees.

In Ford v. Dickinson, Receiver, 280 Mo. 206, l. c. 225, it appears from the statement of facts that a switchman, employed by the defendant receiver of the railway company, was injured while using a track situated upon the premises of a milling company, by reason of coming in contact with a post erected and maintained by the milling company in close proximity to such track. In that case, Judge RAGLAND (then Commissioner), speaking for this division of this court, said: "If the track was negligently maintained dangerously near the post, the receiver (of the railway company) is liable. The master is bound to exercise ordinary care to make the place where his employees work reasonably safe, and where he contracts to do the work on the premises of another, and retains direction and control of the work, the general rule applies, and he must exercise the same care for the safety of his employees that the law imposes on him on his own premises. [Clark v. Foundry Co., 234 Mo. 436, l. c. 454; Penn. Steel Company v. Nace, 113 Md. 460.] Defendant receiver was not required by law to operate the switch tracks in the

mill yard under conditions dangerous to his employees, if it was practicable and feasible for such dangerous conditions to be removed. If he had no such control that he could have removed such conditions himself, he could have required the Milling Company to have done so, or refused, until such change, to do its switching. [Devine v. Delano, 272 Ill. 166.]''

In Kanawha & Michigan Railway Company v. Kerse, 239 U. S. 576, an action under the Federal Employers' Liability Act, a brakeman was injured upon the premises of a brewing company by coming in contact with a timber, erected by the brewing company over its private switch track at a height of approximately 3 1/4 feet above the top·of a box car upon which the employee was standing in the performance of his duties. Mr. Justice PITNEY, speaking for the Federal Supreme Court, said: ''The action of the Railway Company, through its employees, in conducting its switching operations upon a switch obstructed, as this one was, in such manner as to endanger the lives of brakemen upon its cars, speaks so clearly of negligence that no time need be spent upon it. The evidence that the timber had been in the position described for a ·considerable period of time was presumptive evidence of notice to the company, besides which the switch engineer and conductor both testified to actual knowledge on their part, prior to the time of the accident to Barry.''

In Floody v. Railway Company, 109 Minn. 228, l. c. 233, plaintiff, while in the employ of defendant Omaha Railway Company as a switchman, was injured by the derailment of a switch engine upon which he was riding in the performance of his duties, while it was being operated by defendant company over a certain track of the Great Northern Railway Company, pursuant to an agreement between the two railroad companies, which track had been subjected to certain changes and the installation therein of a ''puzzle switch'' of complicated construction, of which changes the defendant company claimed it had no previous knowledge. That court said: ''If, in the regular course of the running of its trains, the appellant company acquired the right to and did use the tracks of other railway companies, and sent the plaintiff out upon these tracks it is difficult to see how it relieved  itself from any of the duties which it owed to the plaintiff as his master. . . . It is almost inconceivable that the Great Northern Company would, without notice to, and in violation of its contract with, the Omaha Company, tear up one set of tracks and construct entirely new ones, unless it believed that, so long as it furnished sufficient trackage to the Omaha Company to enable it to run its trains to and from the Union Depot, it was complying with the spirit of the contract; and the fact that the new tracks were so used without protest for nineteen days prior to the accident is some evidence, at least, that the Great Northern Company

was right in so construing the contract. We do not think that notice of this change to the trainmen was, of itself, notice to the company, but, if in fact the parties to the contract treated it in the manner we have suggested, actual notice of the particular change was not necessary. Upon the other hand, if the evidence does not support this view, the conclusion cannot be avoided that the proper officers of the Omaha Company ought to have known of the change. It knew that its trains were entering and leaving the Union Depot. The obligation was upon it to maintain a safe way for such trains. It did not perform the duty which it owed to its employees, including the plaintiff, if for nineteen days it was possible without its knowledge to improperly divert its trains to tracks which it had no right, and was not willing, to use."

In Doyle v. Railway Company, 127 Mich. 94, l. c. 98, that court has said: "The rule is established by the weight of authority that, when a railroad company runs its trains over tracks owned by another, the company is bound to see that the tracks are in a safe condition" (Citing authorities).

In Stetler v. Railway Co., 46 Wis. 497, l. c. 502, it is said: "The authorities are quite uniform, that where one railroad company uses the track of another company for the purpose of transporting passengers or property, the company transporting the persons or property is liable for any damages which may be sustained, either by the passengers or by the owners of the property so transported, caused by any defects in the road of the other company so used, or by the negligence of the servants or employees of such other company occurring during such transportation. . . . We are also of the opinion that the same rule should apply as between the railroad company and its employees. . . . As between itself and its employees, who were directed to use the road in the business of the defendant company, such employees have the right to treat the road as the company's road, and the company as to its employees was bound to see that such road, whilst so used for its benefit by its employees, was in such condition as not to unnecessarily endanger their lives or limbs."

In Wisconsin Central Railroad Company v. Ross, 142 Ill. 9, l. c. 14, the deceased, a switchman in appellant's employ, was killed by the derailment of a car on which deceased was riding, while the car was being transferred to a defective switch track of another railroad company. Said that court: "It is claimed that the appellant is not liable because the defective tracks did not belong either to the appellant, or to the Wisconsin Central Line. But the following propositions are well established both by reason and authority: a railroad company is responsible for accidents caused by defective tracks; it is bound to exercise due care to safely carry the passengers and property entrusted to it; it is, therefore, its duty to see to it

that the road, which it uses for such transportation, is safe and in good repair, whether such road is owned by it or not; if it uses the track of another company for such purpose, it is liable for damages to its passengers or freight by reason of defects in the road of such other company so used by it; this rule applies as between the railroad company and its employees. There is no evidence that the deceased had any knowledge of the defects in the track. Where the employee of a railroad company is directed to use the road of another company in the business of his employer, he has the right to treat such road as the road of the company employing him; and every railroad company, whose employees use the road of another company under its direction or for its benefit, owes it as a duty to such employees to see that such road is not in a condition which will unnecessarily endanger their lives or limbs.''

(b)   It is claimed by appellant that, inasmuch as the evidence tends to show that it was customary, especially when the running tracks No. 7 and 8 were blocked, to run engines and trains over track No. 1 in the Dupo yard at a slow rate of speed of six to eight miles per hour (which respondent testified was the speed of the engine at the time of the derailment), then whatever injury respondent suffered was due to the usual and ordinary risks incident to his employment, which risks he assumed as a matter of law. Appellant cites Seaboard Air Line v. Horton, 233 U. S. 492, and Reed v. Director General of Railroads, 267 Pa. 86, 110 Atl. 254, in support of its contention. In each of the cited cases, however, the evidence tended to show that the defect in the appliance which the employee was using, or the danger of the place in which he was working, was patent and obvious, and the risks thereof were apparent to the employee and must necessarily have been appreciated by him.

**Assumption of Risk.**

The rule respecting the employee's non-assumption of a risk arising from the negligence of the railroad master in failing to provide him with a safe place in which to work is thus clearly stated by Mr. Chief Justice FULLER, speaking for the United States Supreme Court, in Union Pacific Railway Company v. O'Brien, 161 U. S. 451, l. c. 457: ''The general rule undoubtedly is that a railroad company is bound to provide suitable and safe materials and structures in the construction of its road and appurtenances, and if from a defective construction thereof an injury happen to one of its servants the company is liable for the injury sustained. The servant undertakes the risks of the employment as far as they spring from defects incident to the service, but he does not take the risks of the negligence of the master itself. The master is not to be held as guaranteeing or warranting absolute safety under all circumstances, but it is bound to exercise the care which the exigency reasonably de-

mands in furnishing proper roadbed, track, and other structures, including sufficient culverts for the escape of water collected and accumulated by its embankments and excavations. [Citing authorities.] It is the duty of the company in employing persons to run over its road to exercise reasonable care and diligence to make and maintain it fit and safe for use, and where a defect is the result of faulty construction which the employer knew or must be charged with knowing, it is liable to the employee, if the latter use due care on his part, for injuries resulting therefrom.''

The rule was reiterated in Choctaw, Oklahoma & Gulf Railroad Company v. McDade, 191 U. S. 64, l. c. 67, as follows: ''It is the duty of a railroad company to use due care to provide a reasonably safe place and safe appliances for the use of workmen in its employ. It is obliged to use ordinary care to provide properly constructed roadbed, structures and track to be used in the operation of the road. [Union Pacific Railway Company v. O'Brien, 161 U. S. 451.] . . . The servant assumes the risk of dangers incident to the business of the master, but not of the latter's negligence. [Citing authorities.] The question of assumption of risk is quite apart from that of contributory negligence. The servant has the right to assume that the master has used due diligence to provide suitable appliances in the operation of his business, and he does not assume the risk of the employer's negligence in performing such duties. . . . The charge of the court upon the assumption of risk was more favorable to the plaintiff in error than the law required, as it exonerated the railroad company from fault if, in the exercise of ordinary care, McDade might have discovered the danger. Upon this question the true test is not in the exercise of care to discover dangers, but whether the defect is known or plainly observable by the employee. [Texas & Pacific Railway Company v. Archibald, 170 U. S. 665.]''

In Seaboard Air Line v. Horton, 233 U. S. 492, 504, cited by appellant, it is said: ''Some employments are necessarily fraught with danger to the workman—danger that must be and is confronted in the line of his duty. Such dangers as are normally and necessarily incident to the occupation are presumably taken into the account in fixing the rate of wages. And a workman of mature years is taken to assume risks of this sort, whether he is actually aware of them or not. But risks of another sort, not naturally incident to the occupation, may arise out of the failure of the employer to exercise due care with respect to providing a safe place of work and suitable and safe appliances for the work. These the employee is not treated as assuming until he becomes aware of the defect or disrepair and of the risk arising from it, unless defect and risk alike are so obvious that an ordinarily prudent person under the circumstances would have observed and appreciated them. These distinctions have been recog-

nized and applied in numerous decisions of this court. [Railroad Company v. McDade, 191 U. S. 64, 68; Schlemmer v. Railway Co., 220 U. S. 590, 596; Railway Company v. Harvey, 228 U. S. 319, 321; Railway Company v. Hall, 232 U. S. 94, 102, and cases cited.]''

We cannot arrive at the conclusion, suggested by appellant herein, that respondent's injury resulted from a usual and ordinary risk incident to his employment. [Ford v. Dickinson, Receiver, 280 Mo. l. c. 223, 224.]

(c) But appellant furthermore contends that the evidence herein shows that the defective condition of track No. 1 was plainly apparent and obvious to respondent and that he appreciated the danger of using the track; hence, that the risk and danger

**Obvious Danger.** of using the track was assumed by him as a matter of law, although such risk may have been occasioned by appellant's negligence. Plaintiff testified that, while he had been in the Dupo switch-yard several times, yet he had never been over this particular track No. 1 prior to the derailment in question, and ''didn't know it was a bad track before I started down there.'' The evidence tends to show that the derailment occurred at a point in the track a distance of some thirty to forty car-lengths south of the north end of the track, or (as estimated by appellant) some 1200 to 1600 feet south of the north switch where the engine and tender entered upon the track. It was not shown by appellant that respondent could have seen the condition of the track, or the low joint therein, from the footboard of the tender on which he was standing when the tender entered upon the track; nor is there any evidence that respondent was in a position where he could have safely jumped from the foot board or signaled the engineer in time for the engine to have been stopped before reaching the defective place, or low joint, in the track.

In Miller v. Schaff, 228 S. W. 488, 491, wherein respondent, a brakeman, was jarred from a car stirrup upon which he was riding when the car struck a low joint in the track, we said: ''Respondent was under no duty to inspect appellant's track for defects of the kind which the evidence tends to prove injured him. He was a brakeman and in a department of the service distinct from that of maintenance of way. He testified he did not know of the low joint at the place of injury until the car struck it. There was evidence tending to show an absence of broken ties or any patent condition of disrepair at this point. In such circumstances, it cannot be said the evidence conclusively proved assumption of risk. [Dale v. Railway, 63 Mo. l. c. 458; Porter v. Railroad, 60 Mo. 160; idem, 71 Mo. 66; Devlin v. Railway, 87 Mo. l. c. 549, 550.] The test under the rule in the Federal courts is, 'not in the exercise' (by the servant) 'of care to discover dangers, but whether the defect is known or plainly observ-

able.' [Railroad Company v. McDade,' 191 U. S. l. c. 68; Railway Company v. Archibald, 170 U. S. l. c. 671; Railway Company v. O'Brien, 161 U. S. l. c. 457.]''

Again, in Ford v. Dickinson, Receiver, 280 Mo. 206, 223, we said; ''Whether the plaintiff assumed this risk depends entirely on whether he knew, or by the exercise of ordinary care would have known, of it. He cannot be held to have assumed a risk of which he was totally ignorant. . . . There is nothing in the evidence to show that such hazards as the one in question were of frequent occurrence, either in the yards in which plaintiff worked, or on railroads generally. On the contrary, it tended to show that they were extremely exceptional. It cannot then be said that, as a matter of law, it was one of the 'ordinary' risks of the employment of which plaintiff by the exercise of ordinary care was bound to know. He testified that prior to the time he was injured he had never been under the mill shed, that he had never had occasion before that time to observe the relative positions of the posts and the tracks, and that he had no knowledge whatever in respect thereto. . . . The difference between average people in the power of accurate observation is well known, and it cannot be said as a matter of law that the danger arising from the nearness of the posts to the track was so open and obvious that plaintiff will be presumed to have had knowledge of it. [Charlton v. Railroad, 200 Mo. 413.]''

It is also urged by appellant that respondent admitted, in his signed statement put in evidence at the trial, that ''the track involved is in very bad condition from the fact that the rails we're light, being about 80 lbs. when new. They were badly worn . . . and were much shorter than regular rails. *Just prior to the accident,* I had remarked to the foreman that this was a very unsafe track to run a large superheater engine over.'' It is undisputed that the statement was signed by respondent on the day immediately following his serious injury and apparently while he was in the hospital. We infer from the evidence that the statement was prepared and presented to respondent for his signature by a representative of the appellant railroad. Respondent testified at the trial that he read the first part of the statement, but that ''my eyes kind of gave out and I quit and signed it.'' His positive testimony at the trial, on both direct and cross-examination, was to the effect that he had never been over track No. 1, and did not know the condition of the track, or that ''it was a bad track,'' before he started down the track immediately prior to his injury. He denied, on cross-examination, that he had told the switching foreman that ''this was a bad track'' before the crew and engine went upon the track. So far as the signed statement in evidence shows, assuming that the statement be true and that respondent, ''*just prior to the accident,* had remarked to the

foreman that this was a very unsafe track to run a large super-heater engine over,'' such remark may have been made by respondent to the foreman after the crew had entered the track and were very closely approaching the point of derailment, at which time respondent had no opportunity to safely jump from the footboard of the tender or to signal the engineer to stop the engine. Be that as it may, we think that it was the province of the jury (who observed the respondent on the witness stand and had opportunity to view his demeanor while he was under examination) to determine the credibility of the witness and to weigh and reconcile the discrepancies and contradictions, if any, between his testimony and his signed statement. [Conner v. Railroad, 181 Mo. l. c. 416; Huff v. Railway Co., 213 Mo. 495.] In our opinion, the trial court rightly refused appellant's requested peremptory instruction, and that assignment of error must be ruled against appellant.

II. Error is assigned in the giving of respondent's instruction numbered 1, which instructed the jury upon respondent's theory of recovery, upon the ground that such instruction is broader in its scope than the facts proven. This instruction, in brief and substance, **Instruction: Broader than Evidence.** authorized a verdict for respondent if the jury should find and believe that the said track No. 1 was uneven and the ties were rotten and not lying upon a firm and even surface; that appellant's trainmaster directed and ordered the crew to use said track; that the track was not in a condition in which an engine and tender of the style and type mentioned in the evidence could be used with reasonable safety upon such track; that appellant's trainmaster knew, or in the exercise of ordinary care could have known, of such condition of the track and that it was not reasonably safe for use (if the jury should find that it was in such condition and was not reasonably safe for use) before he sent the engine and crew down such track; and that by reason of the foregoing facts and circumstances (if the jury should find that the same existed), the rear wheels or trucks of the tender went off the track and respondent was injured thereby. We think that the facts hypothesized in the instruction (which facts the jury were required to find and believe before returning a verdict for respondent) are embraced within the assignments of negligence charged in the petition, and that there was substantial evidence adduced by respondent upon which a finding of such facts could be predicated. Hence, we conclude that the instruction is neither broader in its scope than the pleadings nor broader than the proven facts; in other words, the instruction is within the purview of both the pleadings and the evidence.

It is claimed that respondent's instruction numbered 1 is irreconcilable with, and contradictory of, appellant's instruction numbered 3. Respondent's Instruction No. 1 told the jury that, if they should find and believe from the evidence that plaintiff was in the exercise of ordinary care for his own safety and was not guilty **Contributory** of any negligence contributing to cause his injury, their **Negligence.** verdict should be for plaintiff, but if they should find and believe from the evidence that plaintiff was guilty of negligence contributing to cause his injury, then in that event their verdict should be for plaintiff, but his damages, if any, shall be diminished by the jury in proportion to the amount of negligence attributable to the plaintiff. Contributory negligence of plaintiff was not pleaded in appellant's answer; therefore respondent's instruction was more favorable to appellant than its pleading warranted and placed a greater burden upon respondent than was necessary. The error, if any, in instructing the jury upon the effect of respondent's contributory negligence, if any, was not prejudicial to appellant. [Berry v. Railroad, 214 Mo. 604.]

Does the instruction, therefore, conflict with appellant's Instruction No. 3, which told the jury that "plaintiff, when he entered the employ of the defendant, assumed the risks, hazards and dangers usual, ordinary and incident to his employment, and such further risks, however created, of which he knew, or which were **Assumption** so obvious that he must have known of them, and which **of Risk.** he could appreciate, and if you find and believe from the evidence that the plaintiff was injured by reason of any such risks, then your verdict must be for the defendant"? Within the purview of the Federal Employers' Liability Act, contributory negligence is one thing, and assumption of risk is another; or, as tersely said in Railroad Company v. McDade, 191 U. S. l. c. 68: "The question of assumption of risk is quite apart from that of contributory negligence." This is especially true under the Federal Employers' Liability Act because that act, by its terms, makes the defense of assumed risk a complete bar to an action thereunder (except where a common carrier has violated a Federal statute enacted for the safety of employees), and furthermore provides that contributory negligence shall not bar a recovery, but shall be considered by the jury only in diminution or reduction of damages. We do not regard the two instructions as contradictory, or as misleading to the jury. If appellant believed that the jury might not draw the proper distinction between "contributory negligence" and "assumed risk," it should have asked an instruction defining and distinguishing those terms.

III. Appellant complains of error in the refusal of its several instructions intended to withdraw from the consideration of the jury

the several assignments, or specifications, of negligence charged in the petition. The trial court did withdraw from the consideration of the jury the fourth assignment of negligence pleaded, **Withdrawal.** by charging the jury that "there is no evidence that the engine in question was run at a dangerous or unsafe speed, or that the engine was run with a sudden spurt or speed over or upon the track in question." We think there was substantial evidence adduced to support each and all of the other specifications, or assignments, of negligence, and that the trial court did not err in refusing to withdraw the same from the consideration of the jury.

IV. Lastly, it is urged that the judgment entered below is still excessive. The jury returned a verdict assessing respondent's damages in the sum of $30,275, and the trial court ordered a *remittitur* to be filed, thereby reducing the judgment to $12,500. The evidence is that respondent's injury resulted in the amputation **Excessive** of all the toes and approximately half of the left foot. **Judgment** At the time of his injury, respondent was 46 years old, had been continuously employed by appellant as a switchman for ten years, and was earning $165 or $170 a month. He was confined to the hospital for eight weeks and received treatments several times each weeks for approximately a year after leaving the hospital. He testified at the trial that he had not walked upon the remaining stump of the foot since receiving his injury, a period of a year and a half. At the time of trial, the wound had not healed but was open and festered, and two sinuses were discharging pus. The attending physician advised that another operation is necessary. In the opinion of the physician, it is necessary, in order to accomplish a healing of the wound, to cut into the decayed area and to remove the dead and decayed tissues and bone and to keep a drain in the wound until it is completely healed. An X-ray photograph showed a necrosis, or rotting, of the third metatarsus bone and considerable necrotic soft tissue. The trial court had the opportunity, necessarily denied to us, of observing the physical condition of respondent and of hearing, from their own lips, the testimony of respondent and the attending physician. In the exercise of his sound judicial discretion, the trial judge, after ordering a *remittitur* of $17,775, deemed a judgment of $12,500 not excessive, and we are not disposed to interfere with, or disturb, his discretion. If respondent were a younger man he might more easily and readily adapt himself to his maimed condition and prepare himself for a different vocation in life, in which he might earn a wage or salary, approximating somewhat that which he was earning at the time of his injury; but respondent has passed the meridian of his life and, at his present age, he cannot so readily adapt himself to his

changed and crippled physical condition, and it is clearly evident that he can no longer pursue his vocation as a switchman or follow longer an active railroad calling. If he continues in the railroad service, he must necessarily take a less active, and consequently a less remunerative, position in the service, such as that of a crossing flagman, messenger or similar lowly position. In Mattice v. Terminal Railroad Assn., 270 S. W. 306, and Zumwalt v. Railroad Co., 266 S. W. 717, wherein the injuries suffered were not unlike those suffered by respondent, we allowed somewhat larger awards of damages to stand.

We find no reversible error in the record before us, and hence the judgment of the circuit court should be affirmed. It is so ordered. *Lindsay, C.,* concurs.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur, except *Gantt, J.,* not sitting.