MILDRED HOMAN v. MISSOURI PACIFIC RAILROAD COMPANY, a Corporation, and CAPITOL STAGE LINES COMPANY, a Corporation, Appellants.—64 S. W. (2d) 617.

Court en Banc, November 7, 1933.

*Rubey Hulen, Montgomery & Rucker, Thomas J. Cole* and *Edward J. White* for appellant.

64

*O. H. Swearingen, Bohling & Bohling* and *Harris, Price & Alexander* for respondent.

HYDE, C.—This is a suit for personal injuries. Plaintiff was very badly injured in a collision between a bus, operated by the defendant Capitol Stage Lines Company, in which she was riding, and a flat car, which was being pushed in front of two cattle cars by a switch engine, of defendant Missouri Pacific Railroad Company. Plaintiff brought suit against both companies, as joint tort-feasors. They will be hereinafter referred to as the railroad and the bus line. The pleadings sufficiently raised the issues herein and there are no points made about them. Each defendant claimed that it was not negligent and that plaintiff's injuries were caused by the sole negligence of the other. The collision occurred at the intersection of Federal Highway No. 50 with the railroad's State Fairgrounds spur track, about a quarter of a mile west of the west city limits of Sedalia, and about the same distance south of the railroad's main line. The spur track ran on south, a little over a mile from this crossing, to the State Fairgrounds.

The collision occurred on Christmas Day, 1928. Plaintiff and her husband got on the bus at Smithton, which is east of Sedalia, and were going to Kansas City. The bus was from one-half to three-quarters of an hour behind its scheduled time when it left Sedalia. There was evidence that the driver said he was going to get to Kansas City on time. Just west of the city limits of Sedalia No. 50

Highway goes over a low ridge, the crest of which is about 500 feet from the spur track crossing. It descends from that point, to the crossing, on a grade of about two and one-half per cent. On the south side of the highway there is a bank from two to three feet in height. This bank increases in height all the way down the hill, and is highest at the railroad crossing. The highway runs east and west and the spur track north and south. There is also a bank along the east side of the spur track, which was partly made by waste dirt from the excavation of the railroad. This bank is also about two feet high, 400 to 500 feet south from the crossing, and increases in height as it nears the crossing. Its highest part is also near the crossing. According to the survey made by the railroad company's witnesses (a Professor of Engineering at the University of Missouri, and the City Engineer of Sedalia) its extreme height is three and one-half feet above the top of the railroad rail. According to some of the plaintiff's witnesses it was about a foot higher than that in places. The field, south of the highway and east of the spur track, was a meadow, which, in some places, was higher than the bank on the south side of the highway. There was a wire fence along the south side of the highway and along the east side of the railroad track. There is considerable conflict in the evidence about weeds in these fence rows and on top of the bank in the railroad right of way. Witnesses for plaintiff and for the bus line said there was such a mass of dead stems of high weeds that the view of a driver on the highway was obstructed. The railroad's witnesses said there were only bare stalks of a few weeds which did not obstruct the view. Just west of the crossing on the south side of the highway there was a farm house, barns and other outbuildings extending south along the railroad track. The railroad track was practically level for some distance south of the crossing. There were two railroad crossing signs on the north side of the highway, one of which was about 375 feet east of the crossing and the other about eighteen feet west of it.

The day of the collision was clear, with the sun shining, the road dry, and not very cold. There was evidence that some of the windows in the bus were open. As the bus went west down the hill toward the crossing there were two automobiles, also traveling west, between it and the crossing. One of these (a Ford) passed the other (a Chevrolet), while ahead of the bus, and then both of them slowed down and stopped. Before reaching the crossing, both drivers became aware of the approach of the switch engine and cars, from the south, on the spur track. The driver of the Ford car, which was the nearest to the crossing, put out his arm as he stopped. The bus came down the hill behind these cars at a rate of speed estimated by most of the witnesses to be at least forty miles per hour. Some witnesses put it as high as forty-five miles per hour, but the bus driver

said it was only twenty-five miles. All the way down the hill the bus driver was blowing the horn. The bus passed both of the other cars and ran on to the crossing at the same time as the flat car, the head car of the three cars, was pushed out on the pavement. The evidence of the occupants of the two cars, which the bus passed, was that it passed the Chevrolet, when it was a little more than 100 feet from the crossing, and the Ford when it was a little less than 100 feet from it. The bus driver's evidence was that he passed both of them farther back than that.

On the switch engine there was an engineer and a fireman. On the flat car, the leading car, was the switch foreman and a switchman. The switch foreman testified that he first realized the bus was not going to stop when it came within 100 feet of the crossing without slowing down; that at that time the north end of the flat car was only about thirty or forty feet from the center of the highway; that he then gave the engineer an emergency stop signal; and that the cars were stopped within that distance after he gave the signal. The cars were moving at from eight to ten miles per hour (some testimony put it as low as six) and there was evidence, for the railroad, that it was not possible to stop in a shorter distance than this. Plaintiff had evidence that a stop could be made, at this speed, in a much shorter distance. The engineer of the switch engine testified that he saw the bus a short time before the switch foreman signaled; that after seeing it he looked to the west on the highway; and that when he looked back he saw the switch foreman's stop signal. The railroad showed that regulations of the Public Service Commission required busses to stop 100 feet from all railroad crossings; and that the trainmen were familiar with this rule and had seen busses frequently stop before crossing this spur track. The bus driver, however, testified that he had lived in Sedalia for several years; that he had observed no use of the spur track except at State Fair time; and that he had never stopped for this crossing.

The evidence of eyewitnesses and others near the scene was in hopeless conflict as to whether the end of the flat car was stopped before or after it reached the center of the pavement of the highway; whether the bus was on the left or right side of the pavement when the collision occurred; whether the flat car had come to a complete stop, and was struck by the bus, or whether it was still moving and was rammed into the side of the bus; and also whether the bell on the engine was ringing and whether the whistle was sounded. The pavement was sixteen feet wide with a shoulder on the side of about eight feet. There was evidence that after the collision the flat car was as much as three-fourths of the way across the pavement. There was also evidence that it was not quite halfway across. According to some witnesses, the bus never got back on the right side of the road after passing the Ford and Chevrolet,

while others testified that it had pulled back to the right side and was as far over the right side of the pavement as it could get when it reached the crossing. While some witnesses testified that the bus, traveling in a northwesterly direction to get back on the right side of the road ran into the side of the flat car, when it was standing still, taking up less than half of the pavement; some said the flat car was moving beyond the center of the pavement and hit the side of the bus; and others who were on the scene could not say positively which happened. The trainmen all testified that the bell was ringing and that the whistle was blown twice with several blasts each time. The bus driver, plaintiff, and others in the bus, said that neither the bell nor the whistle were sounded. Others in the bus said they heard neither, while the occupants of the Chevrolet said they heard only the whistle and occupants of the Ford said they heard only the bell. The result of the collision was that the whole left side of the bus, from the driver's seat to the back wheel, was torn out. Some of the passengers on the left side of the bus were killed and all of the others on that side were injured. After colliding with the flat car, the bus went on over the crossing and off the pavement and knocked down the 8 x 8 post which held the railroad crossing sign. The left front wheel, bumper and fender of the bus were also broken. So far as the evidence shows, this may have been caused by striking either the flat car or the crossing sign post. The north wheels of the flat car were knocked off the rails, toward the west, onto the pavement. The brake staff of the flat car was bent to the west; the pin lifter was torn loose and bent in the same direction; the iron step was bent straight under the corner of the car; there was paint from the side of the bus on the front wheel journal box; and the northeast floor boards of the flat car were full of glass.

It was shown that the railroad had extensive railroad yards in Sedalia. The west yard limits were west of the point where the spur track left the main line and went south to the State Fairgrounds. Stockyards were maintained by the railroad at the State Fairgrounds and also at three different points in the city. The engine, pushing the cars which figured in the collision, was a switch engine and the movement was in charge of a switch foreman who had with him two switchmen. It was shown that the railroad company had the following rule (103b):

"Within yard and station limits, when switching or backing a train or cars over a public crossing at grade, one of the crew must protect the crossing, unless it is protected by a flagman or gates."

The interpretation of this rule as given by a former rule instructor, a witness for the plaintiff, was as follows:

"It means from that movement; and the company's instructions through that rule are that a man must go ahead, if there is no flagman there, and flag that crossing, stop traffic if he can, and, if

not, stop his crew before they proceed across the crossing there. He must go ahead afoot and flag the crossing."

The witness testified that the spur track was a yard track and that the rule applied to it and to the movement from the fairgrounds. The switch foreman said that the operation was a yard movement and a switching movement but that the rule did not apply to this crossing because it was not in town. He testified that his orders were to load two cars of stock at the fairgrounds stockyards and bring them in to town to be put in a train; that as he went out he left one of the switchmen at the main line, a quarter of a mile from the crossing, to see what passenger trains went by; and that they were coming back from the fairgrounds with the switch engine pushing the two loaded cars with the empty flat car in front of them. It was shown that these two cars of cattle were consigned to National Stockyards, Illinois; that farmers in the southwest part, of Pettis County brought stock to the fairgrounds stockyards for shipment, and that carloads of coal and building material were taken over the spur track to the fairgrounds at various times during the year. Cars of material were also delivered there for the State Highway Department and several months prior to the accident many carloads of material for sewer construction were delivered there for the city of Sedalia. Various witnesses estimated the movements, on this spur track, from two or three times a week to almost every day, except during the weeks before and after the State Fair. The evidence of plaintiff and the bus line indicated still less frequent use. During the State Fair, the use of the track and the amount of travel on the highway being increased, a flagman was stationed at the crossing by the railroad. Highway 50 was shown to have a great deal of travel, including several bus lines. At times there were as many as 500 to 600 cars an hour over it. No regular flagman, gates, or signals were maintained at the crossing. The switchman who was left at the main line said that he stayed there to see if passenger train No. 15 went by; that he could have seen it from the crossing; but that he was not instructed to go to the crossing to flag traffic; and that the only time there was ever a flagman at the crossing was during the week of the State Fair.

The yardmaster of the railroad company testified that the fairgrounds spur track was not a yard track but a branch line and that Rule 103b did not apply because the movement was not a switching or yard movement. He also testified he gave the orders for movements on this track; that the crew was a switching crew; and that when they went from the main line onto the spur track they went out of the yard limits. The rule which he said applied to the movement was Rule 103, to-wit:

"When cars are pushed by an engine, except when shifting or

making up trains in yards, a trainman must take a conspicuous position on the leading car."

The word "yard" is defined by the railroad rules as follows:

"A system of tracks within defined limits provided for the making up of trains, storing of cars and other purposes, over which movements not authorized by time table, or train order, may be made, subject to prescribed signals and rules, or special instructions."

The movement at the time of the accident was not one authorized by time table, or train order. There was no claim that any regular time table schedule or train order applied to the spur track or any of the usual movements thereon.

The case was submitted to the jury upon instructions which authorized them to find against either or both defendants. Plaintiff had judgment against both for $35,000, and only the railroad has appealed. No question is raised as to amount of the verdict.

■ Appellant assigns a number of errors which it neither briefs in its points and authorities nor in its argument. They will be considered abandoned. [Burch v. C. C. C. & St. Ry. Co., 328 Mo. 59, 40 S. W. (2d) 688, l. c. 693; St. Louis v. Smith, 325 Mo. 471, 30 S. W. (2d) 729, l. c. 733; see, also, Aulgur v. Strodtman, 329 Mo. 738, 46 S. W. (2d) 172, l. c. 174.]

■ Appellant first contends that its demurrer to the evidence should have been sustained because it conclusively appeared that the trainmen could not have, by the exercise of ordinary care, stopped the train in time to have averted the collision after the bus entered the danger zone. This contention overlooks the fact that, in addition to submitting the case upon negligence under the humanitarian doctrine, the court also submitted it on two other charges of negligence, namely: failure to give the statutory crossing signals by either bell or whistle, and failure to send a switchman ahead of the train to protect the crossing. Since we have determined that there was evidence justifying the submission of the case, on these grounds of negligence, we will consider all of appellant's contentions, concerning the humanitarian doctrine, under its assignment of error striking at the instruction given on that theory of the case.

■ Appellant's next contention is that the only definition of the term "negligence" in any of the instructions was the one, given in plaintiff's Instruction 1A, authorizing the jury to find against the bus line; that this was improper as applied to appellant; that it was misleading to the jury and prejudicial to appellant. This was the only instruction authorizing a verdict against the bus line. It instructed the jury that it was the duty of the bus line "to exercise the highest degree of care in the operation of said bus" and that if they found the bus driver "failed to exercise such high degree of care in the operation of bus or motor coach and negligently and carelessly caused or permitted said bus or motor coach to collide with

said train or drag of cars . . . then the defendant Capitol Stage Lines Company was guilty of negligence and is responsible to plaintiff for damages." This instruction ended with the following definitions of the terms used:

"You are instructed that the term 'highest degree of care' as used in these instructions means such care as a very careful and prudent person would exercise under the same or similar circumstances and that 'negligence' as used *herein* is the failure to use such care."

Appellant's argument is that this amounted to instructing the jury that negligence, as used in all of the instructions, was the failure to use the highest degree of care; and that the jury would understand that the railroad, as well as the bus company, were under the duty to exercise the highest degree of care, when its duty only was to use ordinary care under any of the grounds of negligence charged against it. We cannot agree with this contention. It will be noted that the definition of "negligence" was limited to "negligence as used herein," to-wit: in this instruction; rather than "therein" or "as used in these instructions" as in the case of the definition of "highest degree of care" just preceding it. Plaintiff's instructions, on the humanitarian doctrine and the failure to protect the crossing by a flagman, used the term "ordinary care" and plainly informed the jury that only ordinary care was required of appellant. Appellant's instructions also used the term "ordinary care," as applied to its duty; and it used the term "negligence" without asking a definition of it. The jury was also instructed at appellant's request that if the appellant's agents "exercised ordinary care in an attempt to avert and prevent a collision" they must find for appellant; that they must "consider the issues in this case as to each defendant separately." We think that the jury was clearly informed that different degrees of care were required of the two defendants, and that they could not have been misled by the quoted part of plaintiff's Instruction 1A, nor failed to understand that it applies only to negligence of the bus line. Certainly, appellant cannot complain of this as error, when it used the same terms and did not ask a definition or distinction of them as applied to it. [Hobart-Lee Tie Co. v. Grodsky, 329 Mo. 706, 46 S. W. (2d) 859; Nicholson v. Franciscus, 328 Mo. 96, 40 S. W. (2d) 623; State ex rel. American School of Osteopathy v. Daues, 322 Mo. 991, 18 S. W. (2d) 487; Schlueter v. East St. Louis Connecting Ry. Co., 316 Mo. 1266, 296 S. W. 105; Block v. U. S. F. & G. Co., 316 Mo. 278, 290 S. W. 425; Monroe v. C. & A. Ry. Co., 280 Mo. 483, 219 S. W. 68; Gordon v. Park, 219 Mo. 600, 117 S. W. 1163.]

■ In connection with this complaint, concerning the failure to define negligence, appellant says that plaintiff's Instruction 2A is erroneous. This instruction submits the failure to sound the whistle or bell for the crossing. Appellant objects to the following part,

which precedes the direction concerning the failure to give these signals, to-wit: "If you further find and believe that a drag of cars, operated by defendant Missouri Pacific Railroad Company, composed of two cattle cars, was negligently and carelessly pushed north over and across said highway." Appellant says that since "negligence" was not defined except in Instruction 1A, the jury was given a roving commission by this part of Instruction 2A. We think this refers to negligently pushing the cars across the highway without sounding the bell or whistle, which the instruction then requires the jury to find, before they can return a verdict against the railroad. It is connected with this further requirement by the conjunction "and." We think the jury would so understand it and hold it was not error.

■ The next contention made by appellant is that there was no evidence upon which to base plaintiff's Instruction 3A, authorizing the jury to find against appellant, on the charge of negligence that ordinary care required that switchmen be sent ahead of the train to flag the crossing. This instruction, after hypothesizing preliminary facts concerning the spur track and crossing continued as follows:

"If you further find and believe from the evidence that said highway was greatly used by the public, and if you further find and believe from the evidence in this case that the surrounding circumstances and conditions of said crossing on and prior to December 25th, 1928, rendered said railroad crossing unusually dangerous and hazardous, and that under the circumstances and conditions then existing you find and believe from the evidence that railroad management, in the exercise of ordinary care, required that the train or drag of cars operated by defendant Missouri Pacific Railroad Company, if so, should be stopped before crossing said Highway No. 50, or that someone should be sent forward to flag or protect said crossing at said place from approaching trains."

It then authorized the jury to find for the plaintiff if it failed to do these things and they directly caused or contributed to the injuries of plaintiff. Appellant contends that there was no evidence that the crossing was unusually dangerous and hazardous, but that on the contrary, it was shown to be as free from danger as any railroad crossing could be. It further contends that the portion of the instruction which authorized the jury to find "that railroad management in the exercise of ordinary care required" appellant to either stop the train or send someone forward to flag the crossing was beyond the scope of the pleadings; that there was no evidence upon which to base such a finding; and that the instruction gave the jury a roving commission, both, as to what was a dangerous and hazardous crossing, and as to what railroad management required.

It is well settled that there is no general duty to place watchmen or flagmen at grade crossings of public roads or highways and failure

to do so is not negligence *per se*. [16 A. L. R. 1273 note; 71 A. L. R. 1160 note; Grand Trunk Ry. Co. v. Ives, 144 U. S. 408, 36 L. Ed. 485, 12 Sup. Ct. 679; Latham v. Staten Island Railroad Co., 150 Fed. 235; Murphy v. Pa. Railroad Co., 1 Fed. (2d) 929; Becke v. Mo. Pac. Railroad Co., 102 Mo. 544, 9 L. R. A. 57, 13 S. W. 1053; Toeneboehn v. St. Louis-San Francisco Railroad Co., 317 Mo. 1096, 298 S. W. 795.] But where a much traveled railroad crossing is, for any reason particularly dangerous, it is a question for the jury whether the care which a railroad company is required to exercise, to avert accidents at crossings, imposes on the company the duty to station a flagman at that crossing. [Grand Trunk Ry. Co. v. Ives, 144 U. S. 408, 36 L. Ed. 485, 12 Sup. Ct. 679; Evans v. Erie Ry. Co., 213 Fed. 129; Welsh v. Hannibal & St. Joseph Railroad Co., 72 Mo. 451; Galveston Wharf Co. v. Peterson, 11 Fed. (2d) 775; North Pac. Railroad Co. v. Moe, 13 Fed. (2d) 377; Thomas v. Chicago, R. I. & Pac. Ry. Co. (Mo. App.), 271 S. W. 862; Toeneboehn v. St. Louis-San Francisco Railroad Co., 317 Mo. 1096, 298 S. W. 795, 16 A. L. R. note, 1277; 71 A. L. R. note, 1169; 22 R. C. L. 1008, sec. 238; 52 C. J. 202, sec. 1792.] In a leading case on this question the Supreme Court of the United States said:

"As a general rule, it may be said that whether ordinary care or reasonable prudence requires a railroad company to keep a flagman stationed at a crossing that is especially dangerous is a question of fact for a jury to determine, under all the circumstances of the case, and that the omission to station a flagman at a dangerous crossing may be taken into account as evidence of negligence, although in some cases it has been held that it is a question of law for the court. It seems, however, that before a jury will be warranted in saying, in the absence of any statutory direction to that effect, that a railroad company should keep a flagman or gates at a crossing, it must be first shown that such crossing is more than ordinarily hazardous; as, for instance, that it is in a thickly populated portion of a town or city; or that the view of the track is obstructed either by the company itself or by other objects proper in themselves; or that the crossing is a much traveled one, and the noise of approaching trains is rendered indistinct and the ordinary signals difficult to be heard, by reason of bustle and confusion incident to railway or other business; or by reason of some such like cause; and that a jury would not be warranted in saying that a railroad company should maintain those extra precautions at ordinary crossings in the country. . . .

" 'In a crossing within a city, or where the travel is great, reasonable care would require a flagman constantly at the crossing, or gates or bars, so as to prevent injury; but such care would not be required at a crossing in the country, where but few persons passed each day. The usual signal, such as ringing the bell and blowing the whistle,

would be sufficient.' '' [Grand Trunk Ry. Co. v. Ives, 144 U. S. 408, 36 L. Ed. 485, 12 Sup. Ct. 679, 12 Am. Neg. Cas. 659.]

So it has also been said:

"Whether or not any given state of facts describing the surroundings of any particular crossing are such as to mark such crossing as one attended with unusual danger or extraordinary hazard is a question solely for the determination of the jury, unless only one conclusion could be drawn therefrom by all reasonable minds." [Tisdale v. Sante Fe Railroad Co. (Tex.), 228 S. W. 133, 16 A. L. R. 1264.]

Likewise, Ruling Case Law says:

"If a railroad crossing is especially dangerous to travelers, on account of its locality or mode of construction, or because the track is curved or the view obstructed, the railroad company must exercise such care and take such precautions as the dangerous nature of the crossing requires, and failing in this, is guilty of negligence. In other words, if a railroad company, in the management of its business, causes unusual peril to travelers, it must meet such peril with unusual precautions, and failing in this is guilty of negligence. This rule is particularly applicable where the traveler's view of approaching trains at a crossing is so obstructed that they cannot be seen until close to the track. In such a case it becomes the duty of the railroad company to use extra caution to avoid collision, as by a less amount of speed, or by increased warnings or otherwise; or if an unslackened speed is desirable, by keeping a watchman on duty, or some other sufficient means of warning travelers." [22 R. C. L. 990, sec. 217.]

In light of these authorities and the evidence in this case that there was an obstruction of the view at the crossing, by the contour of the field, the embankments, the weeds and fences; that the track was a switch track not used by regular trains; and that there was a very great amount of travel on the highway, we hold it was proper to permit the jury to pass upon the question of whether the crossing was so unusually dangerous and hazardous as to require the railroad to do something more to warn travelers, of the approach of switch engines and cars, than to merely give the statutory crossing signals. Likewise, in view of the railroad company's rule, requiring a member of a switching crew to flag grade crossings, when yard switching movements were being made; in view of the conflicting evidence as to whether or not this was a yard movement; in view of the considerable amount of material and livestock handled by switching crews between the Sedalia station and the State Fairgrounds; and in view of the fact that one of the switchmen was left to await the return of the switch engine and cars, within a quarter of a mile of this crossing, with nothing to do except to sit around and observe whether or not a particular passenger train passed on the main line; we hold

that it was proper for the jury to say whether or not ordinary care required that someone of the switching crew flag or protect the crossing before the switch engine and cars crossed it. So far as the use of the words "railroad management" is concerned, the real question is whether ordinary care required this precaution rather than whether "railroad management" required it and that was the real question the instruction required the jury to pass upon. The same objection to the use of the words "that railroad management in the exercise of ordinary care required" that the crossing be flagged, was made and overruled in the case of Toeneboehn v. St. Louis-San Francisco Ry. Co., 317 Mo. 1096, 1. c. 1116, 298 S. W. 795, 1. c. 804. That case, like this one, was a much traveled crossing near but outside city limits.

■ We next come to the question of whether the case was properly submitted upon the humanitarian doctrine. We think it was. Appellant's contention is: First, that the court was not justified in submitting the case upon the humanitarian doctrine at all, because it conclusively appeared that the cars could not have been, by the exercise of ordinary care, stopped, in time to have averted the collision, after the bus entered the danger zone; second, that the instruction submitting it was improper, because it combined primary negligence with the humanitarian doctrine, was misleading and failed to take into account the failure of the bus driver to stop for the crossing. This court has said concerning the function of the court and jury in humanitarian cases: "If a given case in that regard is so plain that average, fair-minded men cannot reasonably differ about it, a recovery may be denied as a matter of law. . . . But if there is a ground for fair difference of opinion about it, then the question is for the jury." [Ellis v. Met. St. Ry. Co., 234 Mo. 657, 138 S. W. 23; Logan v. C. B. & Q. Railroad Co., 300 Mo. 611, 254 S. W. 705.] We hold that there is ground for difference of opinion about it in this case.

Appellant's argument is upon the theory that the engineer stopped, as soon as he could have stopped, after he got the stop signal from the switch foreman. Assuming that is true (although there was evidence that the engineer said, after the accident, that when he first saw the switch foreman signaling he did not know whether he was signaling to him or waiving to someone on the highway), that does not settle the matter. The evidence showed, and the engineer testified, that he could have seen the bus at any time after it came over the crest of the ridge, 500 feet from the crossing. His testimony was that he did see it; that after he saw it he turned away from it and looked in the other direction; and that when he looked back he got the signal from the switchman. The evidence showed that the bus came all the way down the hill and onto the crossing without ever slackening its speed and with its horn blowing all the time.

Appellant says that the trainmen were justified in assuming that it would stop within 100 feet of the crossing, as the Public Service regulations required and as other busses did; and that the bus did not enter the danger zone, until it passed the 100-foot mark without stopping. Appellant contends that the trainmen could not have been aware that the bus was coming into a position of a place of danger until that time; and that there was not sufficient time, after it did come within that distance, to stop the cars and avoid the collision by anything the trainmen could have done.

Appellant's argument, however, is based upon the time it took for the switch foreman to signal the engineer and the engineer to, thereafter, stop. It overlooks the fact that the evidence shows that the bus, with the horn blowing and with unslackened speed, was preparing to pass the other automobiles before it got 100 feet from the crossing. The duty of the trainmen did not, as a matter of law, commence only after the bus entered the 100-foot zone. It commenced at such time as they saw or could have seen, by the exercise of ordinary care, that the driver of the bus was intent on pursuing his journey across the track, oblivious to the danger. Appellant's argument also overlooks the fact that it was the duty of the engineer, as well as the switch foreman, to look out for the bus, or any other vehicles on the highway. He was operating the switch engine and had the means of stopping at hand. *If he saw or could have seen,* by the exercise of ordinary care, that the bus driver, oblivious to the danger, was intent on pursuing his journey across the track, *it was his duty to act,* without waiting for anyone else to tell him to act. From his own testimony, the jury were justified in believing that he was negligent in taking his eyes off of the bus when he saw it speeding toward the crossing; that he looked away too long; and that, by the exercise of ordinary care, he could have observed the bus coming into a place of danger in time to have stopped the cars and avoided the collision.

■ We fail to find any error in plaintiff's Instruction 4A submitting this issue. Antecedent negligence cannot be considered in determining liability under the humanitarian doctrine. "When such peril arises the doctrine seizes upon the situation as it then exists and requires the one operating the dangerous instrumentality to exercise ordinary care in certain respects—to make timely discovery of the peril, if it was his duty to be on the lookout, and thereafter to avoid the infliction of the threatened injury, if he can do so with the means at hand and without jeopardizing the safety of himself and others." [Alexander v. St. Louis-San Francisco Ry. Co., 327 Mo. 1012, 38 S. W. (2d) 1023; State ex rel. Fleming v. Bland, 322 Mo. 565, 15 S. W. (2d) 798; Vowels v. Mo. Pac. Ry. Co., 320 Mo. 34, 8 S. W. (2d) 7; Banks v. Morris & Co., 302 Mo. 254, 257 S. W. 482; State ex rel. Vulgamott v. Trimble, 300 Mo. 92, 253 S. W.

1014; Eppstein v. Mo. Pac. Ry. Co., 197 Mo. 720, 94 S. W. 967.] Plaintiff's Instruction 4A required the finding of these necessary elements. ■ Furthermore, no negligence of the bus driver could be imputed to plaintiff, a passenger, to bar her recovery under any of the charges of negligence. [Smith v. St. Louis-San Francisco Ry. Co., 321 Mo. 105, 9 S. W. (2d) 939; Montague v. M. & K. Interurban Ry. Co., 305 Mo. 269, 264 S. W. 813; Treadway v. United Rys. Co., 300 Mo. 156, 253 S. W. 1037; Becke v. Mo. Pac. Ry. Co., 102 Mo. 544, 13 S. W. 1053, 9 L. R. A. 157.]

■ Appellant further contends that the court erred in refusing to permit expert automobile repair men to give opinions, from an examination of the bus and flat car, as to the position of the bus and the flat car at the time of the collision. Appellant had a number of eyewitnesses who testified that the position of the bus, at the time of the collision, was exactly what appellant's offer of proof showed the opinion of these experts would be. Even if this was admissible, with such an abundance of direct evidence of what happened, it would not be prejudicial error to exclude these opinions. [Irwin v. St. Louis & San Francisco Ry. Co., 325 Mo. 1019, 30 S. W. (2d) 56; Gilchrist v. Kansas City Rys. Co., 254 S. W. 161.] Appellant's experts were permitted to tell what the injuries to the bus were and photographs of the bus and flat car were introduced. But, although other witnesses testified that the bus was not, when the collision occurred, in the position appellant's witnesses said it was, we do not think that the matter required expert testimony. The nature and location of damage to the bus and flat car and their relative positions at the moment of the collision were not matters of an unusual, complicated or technical nature.

One test of whether opinions of experts should be received "is whether the court or jury will be aided by receiving the evidence." [22 C. J. 642, sec. 736.] "The necessity for such testimony arises where the subject matter of an inquiry is so far removed from the realm of common experience that the ordinary jury, even when the facts are fully placed before them, cannot fairly be expected to draw a correct inference therefrom, and at the same time no person competent to draw such an inference has personal knowledge of the facts." [22 C. J. 639, sec. 733; see, also, 11 R. C. L. 572, sec. 7; Muff v. Wabash Ry. Co., 22 Mo. App. 584; Dammann v. St. Louis, 152 Mo. 186, 53 S. W. 932; Benjamin v. Met. Street Ry. Co., 133 Mo. 274, 32 S. W. 590; Winters v. Hannibal & St. Joseph Ry. Co., 39 Mo. 468; Gage v. St. Louis Transit Co., 211 Mo. 139, 109 S. W. 13.]

Appellant relies upon Patrick v. Steamboat J. Q. Adams, 19 Mo. 73, where there was a collision between two steamboats. A passenger who was not an eyewitness was allowed to state "the shape of the fracture made in the Shelby by the defendant's bow, and the im-

pression made upon his mind as to the position in which the boats came together." The court held this was proper, saying: "The fracture which the Shelby received might afford a sure means of judging the position at the time of the collision." What the witness stated in the way of an opinion or conclusion is not set out. From the reason which the court gave, it would seem that it may only have meant to hold that it was proper to describe the shape of the injuries as corresponding to the bow of the other boat. At any rate, it is undoubtedly true that the average juror was never as familiar with navigating steamboats as he is today with driving automobiles. It would seem that Clear v. Van Blarcum (Mo. App.), 241 S. W. 81, a case of a collision between an automobile and a team of mules, presents a situation more like that presented here. There the question was from what direction the car came and whether it struck the mules amidship or astern. Three witnesses, one a veterinarian, fully described the wounds on the mules and conditions observed in the vicinity of the accident. The Kansas City Court of Appeals held that it was reversible error to permit these witnesses to give an opinion that the car ran into the mules from behind. The development of paved highways and the increasingly common use of automobiles, in recent years, has made the average citizen familiar with them and conditions arising from their use. The farmer knows automobiles about as well as he knows his mules or his farm machinery. The city man is as familiar with them as he is with any other appliance of modern life. It would seem that a jury of ordinary, reasonable, intelligent men, with all the direct evidence of eyewitnesses, photographs, and descriptions of the damage, were as well qualified to form an opinion, as to how the bus and flat car came together, as these experts.

Appellant briefs no further assignments of error in its points and authorities. In its argument, however, it complains of the action of the court in excluding the answer of the bus line, filed in proceedings before the Public Service Commission, in which it stated that it had instructed all of its drivers to stop within 100 feet of all railroad crossings and that it had discharged the driver of this bus. Appellant likewise complains, in its argument, of instructions, given at the request of the bus line, which it says in effect excused the bus driver on account of his failure to stop. These matters, if error at all, were error in favor of appellant's codefendant. It therefore cannot complain, especially since the jury also found a verdict against the codefendant. [Maher v. Donk Bros. Coal & Coke Co., 323 Mo. 799, 20 S. W. (2d) 888; Leighton v. Davis, 260 S. W. 986; Beal v. C. B. & Q. Ry. Co., 285 S. W. 482; Brickell v. Fleming, 281 S. W. 951; Clark v. St. Louis & Suburban Ry. Co., 234 Mo. 396, 137 S. W. 583; Beave v. St. Louis Transit Co., 212 Mo. 331, 111 S. W. 52.]

Only when instructions, given at the request of a codefendant, affect the question of the other defendant's liability to the plaintiff is there error prejudicial to such defendant. [Story v. People's Motorbus Co., 327 Mo. 719, 37 S. W. (2d) 898; Barr v. Nafziger Baking Co., 328 Mo. 423, 41 S. W. (2d) 559.]

Finally, in its argument only, appellant makes complaint of the trial court refusing several instructions offered by it. Why this is error, is not pointed out, except by the general statement that "they properly declare the law." We find, however, that, insofar as they did "properly declare the law," such matters were fully covered by the instructions which the court gave. The case was well and fairly tried.

The judgment is affirmed.

PER CURIAM:—The foregoing opinion by Hyde, C., in Division One is adopted as the opinion of the Court en Banc. *Gantt, C. J., Atwood, Ellison* and *Frank, JJ.,* concur; *Leedy* and *Hays, JJ.,* concur in result; *Tipton, J.,* not sitting.