**Robert HESS, Appellant,**

**v.**

**CHICAGO, ROCK ISLAND AND PACIFIC RAILROAD COMPANY, Respondent.**

**No. 55802.**

Supreme Court of Missouri,
Division No. 2.

April 10, 1972.

Motion for Rehearing or to Transfer to Court en Banc Denied May 8, 1970.

Donald L. James, Daniel T. Rabbitt, Moser, Marsalek, Carpenter, Cleary, Jaeckel, Keaney & Brown, St. Louis, for appellant.

Coburn, Croft, Shepherd & Herzog, John C. Shepherd, John R. Musgrave, St. Louis, for respondent.

HENRY I. EAGER, Special Commissioner.

Plaintiff here seeks $300,000 for personal injuries suffered in a railroad crossing accident. There was a unanimous verdict for the defendant. The injury occurred on September 16, 1966, at a crossing of Creve Coeur Mill Road and the Rock Island tracks in St. Louis County; plaintiff was traveling generally south in a Volkswagen and the freight train, with three diesel units and 72 cars, was traveling east at a speed generally agreed to be 35 miles an hour. We shall refer to the crossing as the Mill Road crossing. The road was a two-lane asphalt road, 20 feet wide; the railroad consisted of one track. Plaintiff had negotiated a curve to his left about 100 yards north of the track, from which the road was relatively straight; there was an incline leading up to the track which was 4–5 feet above the level of the road. The train thus came from plaintiff's right; the track from that direction approached the crossing at a somewhat obtuse angle. Much of the controversy develops from evidence concerning vegetation along the road and on the right-of-way supposedly obscuring the vision to the right. The extent of obscurity was perhaps the chief issue. Plaintiff offered and the Court received in evidence 11 photographs, obviously taken from various distances on both sides of the track and including one aerial view. There was a field of standing corn on plaintiff's right, running to or very close to the right-of-way. On the right-of-way there were weeds and brush which were, on conflicting evidence, said to be anywhere from waist high to six or eight feet high. Some weeds extended comparatively close to the track. Plaintiff testified that he stopped at 5–6 feet from the track, looked both ways and listened and could not see or hear a train. No photo was identified as taken from that spot, and no photo was offered with a train or

engine on the track. It is virtually impossible to tell from these photos at what point such a train could have been seen from the position where plaintiff says he stopped. Some of them indicate a very considerable obstruction of the view but were obviously taken from positions farther back from the track. (Exhibits 5, 6, 7 and 8 for instance.) Exhibits 9 and 10, looking west along the track, show extensive vegetation on the north side, but it is impossible to tell from them how much this obscured the view at the crossing. The road on the south side of the track ran substantially parallel to the track for some distance and a train could readily be seen from that side. Just south of the crossing the road turned sharply to the right. As plaintiff approached the crossing he passed highway signs indicating a railroad crossing and a curve. These were some distance back. There were wooden "cross-buck" signs at the crossing on each side of the track, but no other protective device. The train was several hours late. The plaintiff was not really familiar with this road; he had been over it two or three times. He stated that he did know he was approaching a railroad crossing. He was a high school teacher and was on his way from St. Charles to Lindbergh High School.

Plaintiff testified, as stated, that he stopped with the front of his car five or six feet from the track, looked and listened, but saw nothing and heard nothing. He further said on cross-examination that he stopped for "maybe" a minute or two. He testified that the cornfield ran to within 30–40 feet of the track, that the weeds and other growth beyond were five or six feet high, and that he could not see through them; that he could then see only about a car's length to his right, meaning a Ford car, with the weeds only a few feet from his car; that he then started up, looking straight ahead, and attained a speed of two or three miles an hour, when he saw a "big blur" and his car was struck. Actually, the left front of his car was struck by the left front of the engine. These points

of contact were due to the angle at which the track crossed the road. Plaintiff suffered very substantial injuries, but they are not material on this appeal.

Other witnesses for plaintiff testified: (Buchanan) that the weeds on the right-of-way in September were 6–8 feet high and that there were also some small trees; that he would stop 5–8 feet back from the rails and listen, since he could not see, and if he heard no whistle, he would move on up farther where he could see; (Viefhaus) that there was heavy growth along the right-of-way at this point, and that one had to get to a point 12–15 feet from the tracks before he had any visibility for any distance; (Mrs. Swerlein) that there were "shrubs" along the tracks, quite tall, and higher than a car; that when you're right up to the track you can see "quite a distance," but that at five feet "you couldn't see too far"; that there were "lots of shrubs, weeds * * * up to the track." This last witness, traveling behind plaintiff, did not see the engine before the collision and heard no bell or whistle; but on cross-examination she estimated that from 12–15 feet back from the rails one could see "fairly good down there, at least to the next crossing * * *." Her testimony was somewhat inconsistent.

The track was straight for about two miles before reaching the crossing; there was a "big windshield" on the engine; the crossing could be seen for about half a mile.

The engineer testified: that he saw the car for "a fraction of a second" before the impact, when the engine was less than 100 feet from it; that he was running at 35 miles an hour; that the brakeman saw the car first and shouted to him; that he applied the emergency brakes but that 23 cars passed the crossing before the train could be stopped; that the bell and whistle had been sounded continuously for a quarter of a mile and also just previously for another crossing; that one had to be "right up close" to Mill Road crossing to have any

vision down the road; that there were some weeds near the crossing, but "not over waist high." The brakeman riding on the engine testified: that he had been over the crossing many times; that he was seated on the left and was looking to the left; that he first saw the car when the engine was about 100 feet away, that the car was moving but that he had no idea that it would come on the track; that when he saw that it was not going to stop he "yelled" at the engineer; he estimated that the car was 60 feet north of the rail when he first saw it; that plaintiff did not bring his car to a stop; that he saw the top of the car first, as it came up the incline; that "in places" the weeds and shrubs were "at least" as high as the corn; that the train itself made a "loud humming sound."

One witness for defendant, Mr. Lenck, was driving north and stopped at the crossing just as the train reached it; he had seen the train for some distance since his part of the road was parallel to and substantially lower than the tracks; he testified: he heard the train whistle; that he did not see any car stopped on the other side and did not know of the accident until the train stopped; that the elevation of the track was such that he could not really see across the track; that he had traveled south across the same crossing around that date and did not believe that the weeds obscured his view "because of the relative height of the train to the weeds."

There was a metal, diamond shaped speed sign on the south side of the track, with "30" above and "25" below; this was located several hundred feet west of the Mill Road crossing. The conductor testified that the regular speed in this area was 35 miles, that the sign was an "approach" sign and meant that the speed of a freight train should be reduced to 25 miles an hour at a point 4,000 feet from the sign; in other words, that there was no violation of the speed zone at this crossing. The evidence fairly shows that there was a substantial amount of travel on Mill Creek Road; by one witness it was described as "relatively heavy" at

that time; by another as "terribly heavy" before Highway 244 was opened, as "dead" for awhile thereafter, and as "considerable" at time of trial in February 1970. We do not know when Highway 244 was opened. There were four cars on the road in the general neighborhood of this crossing at the time of this accident about 8:15 a. m. The place was essentially a rural area but not far from more populated areas. There were cornfields on both sides of the road as plaintiff approached this crossing and an exhibit shows open fields across the track to the south. Further facts and rulings on evidence will be developed in the discussion of certain evidentiary points.

Plaintiff pleaded sundry assignments of negligence. He submitted two: "First, defendant either: drove its train at an excessive speed, or failed to warn of the approach of its train * * *." His Instruction "C" was refused by the Court. It was as follows: "Your verdict must be for plaintiff if you believe: First, the railroad crossing in question was much traveled and customarily used by vehicular traffic and the public in general, which defendant knew or by the exercise of ordinary care could have known, and

"Second, under all the circumstances shown by the evidence said crossing was unusually dangerous for public use, which defendant knew or by the exercise of ordinary care could have known, and, Third, under all the circumstances shown by the evidence defendant should have in the exercise of ordinary care provided additional warning to the general public of the approach of its train to the railroad crossing in question, and

"Fourth, defendant negligently failed to so provide additional warning of the approach of its train to the said railroad crossing, and

"Fifth, as a direct result of such negligence, plaintiff sustained damage,

"unless you believe plaintiff is not entitled to recover by reason of Instruction

Number ——. [sic] Refused: 2/18/70, /s/ James F. Nangle, Judge."

Defendant asked and was given an instruction on contributory negligence specifying failure to keep a careful lookout or failure to listen. Plaintiff says that there was no substantial evidence to support that instruction and also that the Court erred in refusing Instruction "C."

■ Plaintiff earnestly presses his point on the refusal of Instruction "C." The question of what constitutes an unusually hazardous railroad crossing has given rise to much litigation and perhaps some confusion in Missouri. Plaintiff cites: Homan v. Missouri Pacific Railroad Co., 334 Mo. 61, 64 S.W.2d 617; Toeneboehn v. St. Louis-San Francisco Railway Co., 317 Mo. 1096, 298 S.W. 795; Pentecost v. St. Louis Merchants' Bridge Terminal R. Co., 334 Mo. 572, 66 S.W.2d 533; Jenkins v. Wabash Railroad Co., Mo., 322 S.W.2d 788; Benton v. Thompson, 236 Mo.App. 1000, 156 S.W.2d 739; Coffman v. St. Louis-San Francisco Railway Co., Mo., 378 S.W.2d 583; Borrson v. Missouri-Kansas-Texas R. Co., 351 Mo. 214, 172 S.W.2d 826; Hein v. Terminal R. R. Ass'n of St. Louis, 359 Mo. 946, 224 S.W.2d 963. In certain of these cases the street or road was either *in* a city or large town or was a *very* heavily traveled state or federal highway, and in addition there were more or less permanent obstructions of the view. Homan, Pentecost, Benton, Coffman, Hein, supra. This, in itself, distinguishes those cases from ours in a material respect. In Jenkins and Pentecost, supra, although the instructions are not set out verbatim, it is obvious that the jury in each case was instructed that it might consider whether the crossing was dangerous (or unusually dangerous) *on the issue of excessive speed* but not as requiring additional warnings; this, by reason of the fact that the existence of negligent speed at common law is dependent upon all the facts and circumstances,—and the defendant must operate at a speed which is reasonable in proportion to the danger. Pentecost, Jenkins, Toeneboehn, supra.

Here plaintiff did not seek to use the theory of a dangerous crossing merely as affecting defendant's negligence or non-negligence on the question of speed. (Quaere: whether he could have done so by instruction under MAI principles; but counsel assuredly could have argued it and probably did); plaintiff's instruction fixed a requirement of "additional warning"; this, of course, meant flasher lights, gates, or a flagman, for the general submission that defendant "failed to warn of the approach of its train" (bell or whistle) had been submitted in Instruction No. 2. The general rule concerning the submission of the requirement of additional warnings because of an unusually hazardous crossing is stated in Homan, Borrson, and Coffman, supra. In substance, it is that such an instruction may be given when there is substantial evidence that the crossing is: in a thickly populated area, usually a town or city; on a heavily traveled road or street; that the view is so obstructed by existing objects (natural or artificial) or by such construction of the crossing or track that one cannot have a reasonably clear view until substantially on the track. In most of the cases cited two or more of these elements combined. Homan, Toeneboehn, Coffman, Borrson, Hein, Benton. In Jenkins and Pentecost, as stated, the element of unusual danger was submitted only as hypothesizing a negligent speed of the train. The principle is discussed in the recent case of Houghton v. A T & S F R Co., Mo., 446 S.W.2d 406; that case is not apposite on the facts, but the general rule is recognized. Defendant's cited case of Chaney v. Wabash R Co., Mo., 422 S.W.2d 349, where plaintiff motorist struck a train *standing* on a crossing is not in point, and the author of the opinion, himself, distinguishes the case from those of the present type.

■ We have concluded that the evidence here did not require or justify the giving of Instruction C. The crossing was in a relatively rural area of St. Louis County, the northeast section; it was not actually

shown that the traffic was heavy on that road in and around September 1966; the track was straight and the angle of approach was not such as in itself to obscure the vision; it is not shown that the vision was obstructed at all on the other side of the track; and, finally, the photographs and the other evidence for plaintiff, considered together, do not, in our opinion, constitute evidence of probative value of such an obstruction as would have effectively shut off plaintiff's view before he reached the track; we must and do consider this question within the rules of the decided cases fixing plaintiff's duty to look and listen up to a point where he could see. Plaintiff did not look again after the front of his car was 5–6 feet from the track; the photographs do not, by any means, establish an obscurity of vision to the west from the position where he says he stopped; in fact, Exhibits 1, 5, 6 and 11 seem to show that there would not have been such a degree of obscurity as plaintiff described, looking from a spot reasonably near the track. There were no noises in the neighborhood to prevent plaintiff from hearing the train, even if it did not whistle. Two of plaintiff's witnesses indicated a probable substantial vision from a spot 12–15 feet north of the track; and the front of the diesel locomotive was 15 feet high. Thus, we find that the crossing was not one so unusually hazardous that defendant could be found negligent in not furnishing flasher lights, crossing gates, or a sounding bell. Certainly in view of the requirement of a reasonable speed under all existing conditions and circumstances, the presence of the weeds and brush could have been and undoubtedly was argued to the jury. See, as already noted, Jenkins v. Wabash Railroad Co., Mo., 322 S.W.2d 788; Pentecost v. St. Louis Merchants' Bridge Terminal R. Co., 334 Mo. 572, 66 S.W.2d 533. Under all the circumstances we are constrained to hold that there was no error.

■ The plaintiff claims that it was error for the Court to give Instruction No. 3 on contributory negligence because, it is said, plaintiff testified that he stopped, looked and listened and could not see more than a car's length to the west because of the weeds and brush; also, that this was supported by the photographs and by the oral testimony already referred to. Counsel further say that there was no evidence to "support the proposition" that he failed to keep a lookout. We have determined that the Court did not err in giving the instruction.

In the first place, the jury did not have to believe plaintiff's testimony. The head brakeman testified that he first saw plaintiff's car about 60 feet north of the tracks, that it was moving, and that it did not stop. Mr. Lenck testified that he did not believe that the weeds were "any factor" in obscuring the vision because of the "relative height of the train to the weeds." Further, plaintiff only had his left vent window open, and had his radio operating; and when he started up again he looked straight ahead, not looking again for a train. The photographs are certainly not conclusive of an obstructed vision. The point from which any of them was taken was not shown; they show weeds and brush, relatively high, along the right (west) side of the road near the track, but it is impossible to tell from them what the view would have been from the point where plaintiff says he stopped and looked. Also, Mr. Lenck, on the other side of the track, distinctly heard the train whistle.

■■ It was plaintiff's duty not only to look and listen but to see and hear what a motorist in the exercise of the highest degree of care would or should have seen and heard in approaching that crossing. Lohmann v. Wabash R. Co., 364 Mo. 910, 269 S.W.2d 885; Pipes v. Missouri Pacific R. Co., Mo., 338 S.W.2d 30; Short v. Missouri-Kansas-Texas R. Co., Mo., 312 S.W. 2d 50. And one must, if his view is obstructed, continue to look until he can see. Pipes, Short, supra. We have considered plaintiff's cited cases. They are not persuasive here; all but one involved collisions between two cars or one car and a pedestrian, with no such duty involved as is

incumbent upon one approaching a known railroad track. The facts in the other case also make it distinguishable.

▇ Plaintiff's next point is that the Court erred in refusing to permit the witness Buchanan to testify that he had an accident at the same crossing in July 1966 (two months earlier). The principal point states that the testimony was "critical evidence of defendant's notice of the hazardous nature of the crossing." Thus, the point made is on the question of *notice*. Our ruling on Instruction C above lessens, if indeed it does not eliminate, the materiality of such notice. The weeds, etc., were still material on the question of speed, but we may assume that defendant knew they were there, for its agents saw them every day. The prior accident could not constitute notice of an unusually hazardous crossing, since we have held (and the trial court held) that it was not such. Plaintiff argues, more or less incidentally, in a subpoint that the evidence was admissible also "for all purposes," since the prior accident was in all respects similar.

Defendant has devoted 12 pages of its brief to its opposition on this point. We may boil this down (omitting some things of necessity) to the contentions: that the offer of proof was insufficient because not showing the same conditions, circumstances, and cause; that the evidence was not offered to prove the dangerous condition; and that plaintiff was not prejudiced. The proposed evidence was discussed in a lengthy colloquy before any witnesses testified. We consider the discussion and the formal offer as constituting plaintiff's offer of proof. Essentially this was: that as Buchanan approached the track in July 1966, his view was blocked by the weeds until he was 6–7 feet back; that he looked, saw nothing, and then went on and nearly made it across, but the rear end of his car was struck by a train going at an estimated speed of 20 miles an hour. Specifically this was offered on the questions of notice and excessive speed. The Court said that the witness might testify to all

existing conditions "to show that it was a dangerous crossing," but that he could not testify to his accident "because circumstances might have been different" and that: "There are too many possibilities in the situation as I see it." As a matter of fact, counsel never did state in the offer that Buchanan was traveling in the same direction as plaintiff, but we think that idea was understood by everyone and we do not rule the point on so narrow a ground.

▇ Under certain circumstances, evidence of prior accidents has been held to be admissible, and defendant so concedes. Wood v. St. Louis Public Service Co., 362 Mo. 1103, 246 S.W.2d 807; Grothe v. St. Louis-San Francisco Ry. Co., Mo., 460 S.W. 2d 711; Vinyard v. Vinyard Funeral Home, Inc., Mo.App., 435 S.W.2d 392. The evidence must be of an accident of like character, occurring under substantially the same conditions, and it must be one resulting from the same cause. These are highly variable factors; it has also been held that adverse factors, such as surprise and probable confusion of issues, may be sufficient to outweigh the probative value of the evidence and require exclusion. Wood, Vinyard, supra. This, of course, indicates that a rather wide discretion resides in the trial court, the exercise of which is generally affirmed unless abused. The trial court in Wood had admitted the evidence, and that action was affirmed on a 4–3 vote. In Grothe no evidence of a prior accident was offered, only of difficulties in hearing the bell and of complaints. The subject is discussed in sundry other Missouri cases. We must also consider the fact that Mr. Buchanan testified graphically to the weeds on the right-of-way at the time of the present accident, to his method of approaching the crossing, to the vision which he had or did not have, and (by implication) that the crossing was rough. Under all these circumstances, we hold that the trial court did not initially abuse its discretion in refusing the evidence.

■ Plaintiff re-offered that evidence after defendant's cross-examination of Mr. Buchanan. His theory was that defendant had opened up the subject by creating an impression that Mr. Buchanan had made numerous safe crossings, and that it had waived its prior objections through the doctrine of curative admissibility. We have examined that cross-examination in detail. The witness there testified: that he knew the track was there and that trains ran on it, and that he saw the signs; that he brought his car to a stop when he crossed the track, that he had "gone over the road" in a southerly direction and stopped 5–8 feet from the rail; that he could not see from there if a train was coming, and he would listen, then moving up to where he could "get a good view" if he heard no whistle. This testimony did not, in our opinion, create any reasonable inference that he had or had not always crossed the track successfully; we hold therefore that the prior objection was not waived nor did the doctrine of curative admissibility come into play.

■ Plaintiff offered to read defendant's answer to his Supplemental Interrogatory No. 2. The interrogatory asked for records pertaining to the cutting of weeds, etc., on the right-of-way at or near the crossing. The answer was, in substance, that a spray train was used on June 12, 1966, and that any further records would be made available to plaintiff upon their receipt by defendant's attorneys. There was no further answer. Defendant objected that this was information "discovery in nature" and should not be considered as substantive evidence, and that the photographs were in evidence showing the conditions. The Court overruled the offer initially on the ground that it was too "remote" to show the condition in September, but added later that plaintiff should have "updated" his interrogatory or "filed for it" before going to trial. On the latter reason the Court was in error. See Laws v. City of Wellston, Mo., 435 S.W.2d 370. However, and whatever the reason, we do not feel that the exclusion of this evidence constituted prejudicial error. It could only have been slightly corroboratory of the very considerable amount of evidence already in the record, oral and photographic, that the weeds and brush were there, with rather vivid descriptions. Plaintiff now says that this evidence was material to show that defendant had assumed an obligation to keep the weeds down, and that it must thereafter have acted with due care. Section 389.660 (2), RSMo 1969, V.A.M.S., creates a duty of weed control on railroads (for the purpose of preventing fires), but it has been held that this does not give rise to a civil cause of action for its breach. Honeycutt v. Missouri Pacific R. Co., Mo., 440 S.W.2d 481, 487. The plaintiff did not offer this evidence for the stated purpose of showing the assumption of any such duty, but to show the height of the weeds and that they had not been cut. A party on appeal is held to the theory of his offer of proof, if the evidence has been excluded. Atherton v. Kansas City Power & Light Co., 356 Mo. 505, 202 S.W.2d 59. Moreover, we have held that the exclusion of this evidence did not constitute prejudicial error, which is a complete answer.

The last point of plaintiff is that the Court erred in permitting defendant's conductor, Ferril Coffman, to interpret and explain two of defendant's operating rules which plaintiff had offered and read into evidence. The first rule (Sec. 98) was in part: " * * * at the end of two or more tracks, junctions, railroad crossings at grade, and drawbridges unless protected by block or interlocking signals, trains and engines must approach end of two or more tracks, railroad crossings at grade, and drawbridges at restricted speed." The other (Sec. 101) concerned procedure to be followed, including restricted speed, "during and after excessive rains, heavy storms, fogs or any condition which may restrict visibility or affect condition of track * *." Mr. Coffman had been an employee of defendant for 27 years and stated that the Rule Book was his "Bible"; he was asked

for the meaning of Sec. 98, supra, and stated that it applied where two railroads cross or join or there was a drawbridge, etc.; plaintiff had objected that the interpretation was for the jury. Along the same line, and over the same objection, the witness testified that Sec. 101 referred to storms, fog, washouts and things of that nature and not to ordinary crossings under usual conditions. Plaintiff did not object because of a lack of qualifications. This evidence was essentially a limited form of opinion evidence, based on operating experience, from one who was to that extent qualified. Its effect was to interpret rules which might well have been ambiguous to a jury. We feel that the admission of the testimony was within the limits of the discretion permitted to the trial court in receiving expert testimony. McConnell v. Pic-Walsh Freight Co., Mo., 432 S.W.2d 292; Parlow v. Daniel Hamm Drayage Co., Mo., 391 S.W.2d 315; Eickmann v. St. Louis Public Service Co., 363 Mo. 651, 253 S.W.2d 122. Plaintiff submitted on common law speed, i. e., a speed which was excessive under the existing conditions and circumstances, and one which was not reasonable in proportion to the dangers. The opinions of the conductor in no way impaired that submission. They tended to show that defendant did not violate its own rules, but defendant could still be negligent, which was the ultimate issue. Evidence had previously been admitted without objection to the effect that the normal and permitted speed at that crossing was 35 miles an hour and, so considered, the present testimony was, at most, merely cumulative.

Finding no reversible error, the judgment is affirmed.

PER CURIAM:

The foregoing opinion by HENRY I. EAGER, Special Commissioner, is adopted as the opinion of the Court.

MORGAN, P. J., HENLEY and DONNELLY, JJ., and PRITCHARD, Special Judge, concur.